**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**GARY CARL SIMMONS, JR.**                                              **PETITIONER**

**VS.**                                              **CIVIL ACTION NO. 1:04CV496HSO**

**CHRISTOPHER B. EPPS, Commissioner,
Mississippi Department of Corrections,
LAWRENCE KELLY, Superintendent,
Mississippi State Penitentiary and JIM
HOOD, Attorney General of the State of
Mississippi**                                              **RESPONDENTS**

---

## MEMORANDUM OPINION AND ORDER

Gary Carl Simmons was convicted of rape, kidnaping, and capital murder (with the underlying felony of robbery) in the Circuit Court of Jackson County, Mississippi, on August 29, 1997. He was sentenced to life imprisonment on both the rape and kidnaping charges and to death on the capital murder charge. Simmons appealed the conviction and sentence to the Mississippi Supreme Court, raising twenty-eight assignments of error, all of which were rejected. *Simmons v. State*, 805 So. 2d 452 (Miss. 2002). In his first petition for post-conviction relief, Simmons raised ten issues, and the court found that they all lacked merit. *Simmons v. State*, 869 So. 2d 995 (Miss. 2004). A subsequent petition for post-conviction relief, filed after Simmons submitted his habeas petition in this Court, was denied as successive. *Simmons v. State*, 942 So. 2d 802 (Miss. 2006). Simmons filed his Petition for Writ of Habeas Corpus in this Court on October 15, 2004, raising fifteen grounds for relief.

## I.  STATEMENT OF FACTS

Some time during the early morning hours of Tuesday, August 13, 1996, Jeffrey Wolfe was shot and killed at Gary Simmons's home in Moss Point, Mississippi. Wolfe had traveled to

Mississippi to collect drug money owed to him by Simmons and Simmons's ex-brother-in-law, Timothy Milano.  Simmons and Milano were tried separately for capital murder and kidnaping, with Simmons being additionally charged with rape.  Simmons received the death penalty; Milano received a life sentence.

Wolfe's companion, Charlene Brooke Leaser, witnessed the shooting and testified that Timothy Milano fired the gun.  Leaser was the primary witness against Simmons.  She testified that she left Houston, Texas, with Wolfe, whom she had dated for only a short time.  Leaser knew that Wolfe was going to Mississippi to collect money that was owed him by some friends, and she suspected that the debt was drug related.  They left Houston around 4:00 p.m. on August 11, 1996, and arrived in Pascagoula in the early morning hours, checking into the Kings Inn Hotel on August 12.  When they left Houston, Leaser had $150 to $200 in her purse and in her pockets, and Wolfe had about twelve hundred dollars. Wolfe also told Leaser that he was armed with a .9 millimeter pistol, although Leaser never actually saw the gun.  The gun was never recovered by police.

On the same day that Wolfe and Leaser arrived in Pascagoula, Simmons worked his regular shift at Wayne Lee's Grocery, where he was a meat cutter.  A co-worker, Charles Jenkins, testified at trial that just before Simmons left work, Jenkins saw him sharpen his knives, wrap them in paper, and leave with them.  According to Jenkins, it was unusual for anyone to take their knives home unless they were quitting or taking a vacation.  When Jenkins inquired about this, Simmons told him that he "might have to skin something out that night."

After they checked into the motel, Wolfe and Leaser slept;  Wolfe then got up and went to see Sonny Milano, Timothy Milano's brother.  Sonny worked at a tire store nearby, and Wolfe had met him during an earlier visit to the area.  Wolfe had expressed an interest in buying some tires and

rims, and Sonny had suggested that he come to his store.  On August 12, Wolfe visited the store, talked with Sonny's boss, and invited Sonny to dinner.  Sonny came to the motel with his fiancee, Jennifer Perry, and they rode with Wolfe and Leaser to a Shoney's Restaurant.

After dinner, the couples returned to the motel.  Sonny took his fiancee home. Wolfe and Leaser then left their motel room and made two trips to Simmons's house around 10:00 or 11:00 p.m., but found no one home.  They returned to the motel.  In the meantime, Sonny had also driven to Simmons's house, where he found both Simmons and Timothy.  Sonny told Simmons that he had just had dinner with Wolfe, and he gave Simmons the name of the motel and the room number where Wolfe was staying.  Simmons then asked Sonny to call Wolfe.  Sonny did so, and Wolfe said that he would be there in a few minutes.   Following the phone call, Simmons asked Sonny to leave, and Sonny's brother, Timothy, asked Sonny to follow him home because his taillights were out.  Sonny followed Timothy home around midnight, and he did not see Timothy again that evening.

After receiving the phone call from Sonny, Wolfe and Leaser made their third trip to Simmons's house.  When they arrived, only Simmons was present, and they sat on the porch for a few minutes, smoked a marijuana joint, and talked.  Leaser testified that during this conversation, Wolfe told Simmons that his roommate had stolen drugs and money from him.  Simmons said that he was glad that Wolfe had finally come for his money, since Simmons was going to "flip it" to make more money selling drugs. Subsequently, Timothy arrived.  After he was introduced to Leaser, Timothy went inside the house.

Leaser testified that she and Simmons went into the kitchen, and she sat down at the kitchen table to roll another joint.  Simmons offered her a beer from the refrigerator, but remained standing. Wolfe was standing in the doorway between the kitchen and the living room, and Timothy was in

the living room.  The three men were talking, and part of the conversation concerned the prior robbery in Houston.  Suddenly, Leaser heard several shots, and saw Wolfe fall to the floor.  Leaser also saw Timothy standing behind Wolfe, with a "big long gun."  Simmons grabbed Leaser, told her not to look, and quickly removed her from the kitchen and took her into a bedroom.  He placed her face down on the floor and lay on top of her, asking whether she or Wolfe were "cops," why they were there, whether they had any drugs, and who knew their whereabouts.

After Simmons finished questioning Leaser, he tied her hands behind her back and to her feet.  He asked Timothy, "What do you want to do with her?"  Timothy said he didn't care.  Simmons placed Leaser in a large metal box in the bedroom.  Leaser managed to untie the rope and began kicking at the box, trying to open it.  Simmons returned, opened the box, and found that Leaser had freed herself.  He took her out and stripped her of her clothes and jewelry.  Simmons tied her up again and placed her back in the box, telling her that he "was on a time frame and not to mess up his time."  Leaser untied the ropes again and began kicking and pushing at the lid of the box, trying to open it.  After some time, Simmons came back.

When Simmons returned this time, Leaser testified that he was naked, and it appeared as though he had taken a shower.  Leaser realized that Simmons was going to rape her, and she told him that she was on her period.  He ordered her to remove her tampon, which she did.  Leaser believed Simmons had a gun, which he placed on the dresser.  Simmons told Leaser that her life depended on how well she performed, then he put on a condom and raped her.  Leaser testified that Simmons offered Timothy a chance to rape her as well, but he declined.   Afterwards, Simmons permitted Leaser to go into the bathroom to clean herself, then he clipped off her fake fingernails, which she had used to scratch him during the rape.

4

Simmons then bound Leaser again, "with my feet to my hands and then a rope around my neck, and all connected like that so that if I moved I would choke myself." However, Leaser managed to untie the rope, which Simmons again discovered. When he returned to the box this time, he brought a joint, which he and Leaser shared. At Leaser's request, Simmons also brought her a blanket, then he shut her up in the box. Leaser fell asleep. She was later awakened by the telephone. When no one answered it, Leaser realized that the house might be empty, and she managed to push the lid off of the box.

Finding no one in the house, Leaser retrieved a garbage bag with the clothes that had been taken from her earlier. She also located her jewelry. Leaser grabbed a butcher knife and some keys and ran across the street to a neighbor's house. By this time, it was daylight. Leaser knocked on the neighbor's door, told her that people in Simmons's house had killed her friend, and asked her to call the police. The neighbor would not let her in the house, so Leaser sat in a swing on the front porch. While she was sitting there, she saw Simmons drive up to his house, and get out of his car with something in his hand. Simmons was in his house for about sixty seconds, then left, empty-handed. Leaser dropped the items she was carrying and hid behind some bushes.

The neighbor who called police was Debbie Seab, who testified at trial that Leaser banged on her front door at about 6:40 a.m. on the morning of August 13. She looked out a window in the door and saw Leaser, who told her that "someone had killed her friend and had locked her in a box." Seab refused to let Leaser in her house, but she did call the police. Seab said that Leaser ran out to the street when the police arrived, "jumping up and down and waving her arms, real upset." Seab later found a set of keys, a ring, and a kitchen knife on her front porch.

5

Leaser was, by her own account, hysterical while talking to the police. She testified that she could not talk and could not stop crying. The police immediately took her back into Simmons's house, where they looked for Wolfe's body. While inside, she noticed her suitcases just inside the front door. The money that Leaser had brought with her from Texas was never recovered. Initially, Leaser told police and medical personnel that both Timothy and Simmons had raped her. She changed her story at trial, explaining that she told police that story so that she could get Timothy in as much trouble as possible.

Rita Taylor, who lived across the street from Simmons, testified that she was awake at about 2:00 a.m. on the morning of August 13. After doing some housecleaning, she went outside at about 3:00 or 4:00 a.m. with some paperwork to put in the glove compartment of her truck. When she did, she saw Timothy Milano unlock Simmons's door and enter his house. A few minutes later, she noticed Simmons and Timothy carrying white buckets to the bayou. Her husband, Donald Taylor, also testified at trial. He told the jury that Simmons had approached him right after work on Monday, August 12, and asked to borrow Taylor's boat. Taylor gave his permission, and he stated that he saw the boat pulled up on Simmons's land when he left for work the next morning. Pieces of Wolfe's flesh were later discovered in the boat.

Tim Hallon, a patrolman with the Moss Point Police Department, was the first officer on the scene. He spoke with Leaser for forty-five minutes to an hour before he could understand what she was saying, because she was so hysterical. She kept saying "they killed Jeff" while pointing to a house across the street. Finally, Hallon and two other officers took Leaser to Simmons's house. Hallon remained outside. Lee Merrill, an investigator with the Moss Point Police Department, was also called to Simmons's house that morning. When he arrived, Officer Hallon and another

policeman were questioning Leaser, whom he described as hysterical.  After about fifteen minutes, he determined that she was saying that she had been raped and held in a box inside Simmons's house and that her boyfriend had been shot in that house.  Merrill admitted that two other officers had gone into the house before he arrived, but believed that it was necessary to conduct a more thorough search.  Merrill and another investigator, Richard Cushman, entered the house to look for a victim. They took Leaser inside briefly, checking the kitchen, living room and bedroom.  Although they did not find Wolfe, they did observe evidence that a crime had been committed, including a tampon on the floor and a gun leaning against the door between the kitchen and living room.  The house was declared a crime scene and secured.

Cushman left to obtain a search warrant.  While the other officers  were waiting for him to return, they discovered pieces of flesh in the boat on Simmons's property.  Further investigation revealed pieces of flesh in the bayou that ran along the west side of Simmons's house.  According to investigators, the bayou ultimately flowed to the Gulf of Mexico and was subject to tidal flow. There was evidence from several witnesses that alligators lived in that bayou.  Concerned that tides and animals in the bayou might destroy the evidence, they began collecting it.  Ultimately, pieces of flesh and blood were found in buckets near the bayou, and also on a knife, a bush hook, a machete, and a scrub brush near the boat.  Searchers found body parts in the water, which they collected with plastic bags.  Officers also obtained a search warrant for the motel room where Wolfe and Leaser had stayed on August 12.  When they executed the warrant, they discovered only a few personal items – a hat, a brush, a Pepsi, and a Reese's Cup, but no clothing or luggage.

Before the officers had finished retrieving body parts from the bayou, Investigator Cushman returned with the warrant, and employees of the Mississippi Crime Lab arrived to collect evidence.

Dr. Paul McGarry, a forensic pathologist, assisted in the recovery of the body parts from the bayou, as did the Jackson County Coroner, George Sherman, and several other officers. They retrieved skin, tissue, muscle, pieces of the chest and abdominal walls, lungs, a heart, a liver, fingers, toes, and sexual organs, all of which bore marks of precision cutting. One of the pieces of skin had one gunshot wound; another piece had five gunshot wounds. There were bullet holes through the heart and the lungs, and a bullet was recovered from the left lung. On the second day, searchers found Wolfe's head, which had been severed just below the jaw, in the middle of the bayou. In total, about one hundred fifty pounds of flesh and tissue were recovered, but not the entire body.

In his examination of the fingers and toes, McGarry noted that slashes had been made across the pads, apparently to prevent fingerprint identification. Tattoo marks on the skin had also been slashed. At trial, McGarry identified the head that was recovered from a photograph. Later, over the objection of defense counsel, Leaser was shown the photograph and identified the head as Wolfe's. McGarry testified at trial that the bullet wounds had occurred while Wolfe was alive, but the remaining injuries, including those inflicted by a hatchet or cleaver, and others by a bolt cutter, occurred after death. Examination of the skin in which the bullet holes were found, as well as of the t-shirt Wolfe was wearing on the night he was murdered, indicated that he was shot at least five times in the back. There was another wound, but it was not clear from either the skin wound or the bullet holes in the shirt whether the shot came from the front or the back. Two other holes in the shirt appeared to be bullet holes – one along the side of the chest and one under the left arm.

Shortly after the murder, Simmons recorded a videotape in which he apparently confessed to having committed a murder and expressed remorse for it. The tape was made for his ex-wife and children and sent to his ex-wife. The day after the murder, August 14, Dennis Guess came home

8

from work to find his friend, Simmons, asleep on his couch.  Simmons confessed to Guess that he had "whacked a drug dealer."  According to Guess, the killing came after a confrontation between the parties -- in Guess's words, "the boy broke bad on him and this is what happened."  Simmons told Guess that he had "deboned him, cut him up in little pieces, and put him in the bayou."  Guess further testified that Simmons admitted that they had sex with Wolfe's female companion and had planned to keep her and "train" her, but she had escaped.  Simmons expressed disappointment that Wolfe only had a thousand dollars on him, as Simmons had assumed he had twenty thousand or so.  After Simmons finished his story, he told Guess that he believed his options were to run, to end his own life, or to turn himself in.  They decided that he should turn himself in, so Simmons called a Jackson County deputy who came and picked him up.

Several employees from the Mississippi Crime Lab tested the evidence gathered from Simmons's house and property, and they testified at trial.  That evidence included weapons, flesh, blood samples, knives, tools, bullet fragments, spent .22 caliber cartridges, clothing, a condom, rope, a bucket, and fingerprints, all of which were admitted into evidence over Simmons's Fourth Amendment objections.  Blood, flesh, and seminal fluid samples were submitted for DNA testing.  Debbie Haller conducted the tests.

On June 27, 1997, the trial court scheduled Simmons's trial for August 25, 1997.  On July 23, the State produced the results of the DNA testing performed by the Crime Lab.  On August 8, Simmons requested that the trial date be continued, so that he could retain an expert to independently examine and test the DNA evidence.  On the same date, he filed a motion seeking funds for an expert to perform that testing.  The motions were argued on August 15.  Simmons's attorney argued that the defense was surprised by the DNA results, which established that only Simmons was at the

murder scene. At that point, it was expected that Leaser would testify that both men raped her; she did not change her story until she was flying to Mississippi for the trial.   Prosecutors opposed the request for a continuance as untimely.

By the date of the hearing, the trial court had already entered an order changing venue to Lauderdale County, Mississippi.  (The jury was selected in Lauderdale County, but the trial ultimately took place in Jackson County.)  Because arrangements had already been made in Lauderdale County for jury selection, the court denied a continuance.  It did, however, grant the motion for a DNA expert to review the Crime Lab's procedures and to attend trial to assist in cross-examination of the State's expert.  On August 19, the court granted the motion for funds, in the amount of $2,000.00.

Simmons went to trial on August 25.  The jury convicted him of all charges.  The State offered no further evidence during the sentencing phase, but Simmons presented several family members, including his ex-wife, to testify for him.  Although he wanted to play the videotape to show that he expressed remorse for the murder, the court sustained the State's objection that it was self-serving hearsay.  After deliberating for about thirty minutes, the jurors returned a verdict imposing the death penalty.  In so doing, the jury found two aggravating circumstances existed:  that the murder was committed for pecuniary gain, and that Simmons knowingly created a great risk of death to many people.

## II. <u>ANALYSIS</u>

### A.  <u>Standard of Review</u>

The applicable portions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which modified 28 U.S.C. § 2254, provide that:

10

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Pursuant to the AEDPA, where the state court adjudicates the petitioner's claim on the merits, this Court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of law and fact are reviewed under § 2254(d)(1). Factual findings are presumed to be correct, and the Court must defer to the state court's decision regarding factual determinations unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The Court independently reviews questions of law and mixed questions of law and fact to determine whether the state court's decision was either "contrary to" or an "unreasonable application of" federal law. *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000); *see also Williams v. Puckett*, 283 F.3d 272, 277 (5th Cir. 2002); *Hill*, 210 F.3d at 485.

For purposes of this analysis, "federal law" is determined by the Supreme Court of the United States, and this Court must follow its precedent to determine whether the state court's decision was "contrary to" or "an unreasonable application of" that established federal law. *Williams*, 529 U.S. at 378, 406; 28 U.S.C. § 2254(d)(1). A state court's adjudication of a claim is *contrary to* clearly

11

established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Perez v. Cain*, 529 F.3d 588, 593-94 (5th Cir. 2008). A state court's application of the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply. *Williams*, 529 U.S. at 406. In *Williams*, the Supreme Court distinguished the term "unreasonable" from "erroneous" or "incorrect;" thus, a state court's incorrect application of the law may be permitted to stand if it is, nonetheless, "reasonable."

**B.  Discussion**

Simmons asserts fifteen grounds for habeas relief. The Court will address them in the order in which they are presented in Simmons's Memorandum of Authorities.

**1.      The Court Erroneously Allowed the Prosecution to Submit to the Jury an Aggravating Circumstance without Sufficient Evidentiary Support in Violation of Petitioner's Eighth and Fourteenth Amendment Rights As Set Forth in the United States Constitution.**

This assignment of error relates to the trial court's permitting the jury to consider as an aggravating circumstance that Simmons had "knowingly created a great risk of death to many people." This circumstance is one of the eight statutory aggravators codified at Miss. Code Ann. § 99-19-101 (1972). Only one other aggravating circumstance was argued – that the capital offense was committed for pecuniary gain during the course of a robbery. The jury found that both circumstances had been proved beyond a reasonable doubt. Simmons contends both that the jury

12

instruction itself was unconstitutionally vague and that there was insufficient evidence to support the verdict with regard to this aggravator.

On appeal, the State argued that the claim was barred, as Simmons did not object to the instruction at trial.  In the initial portion of its opinion, the Mississippi Supreme Court found that this was one of several issues that was barred from review, although it alternatively considered each on the merits.  With respect to this argument, the court recognized that Miss. Code Ann. § 99-19-105(3)(b), required it to determine "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101 . . . ."  Thus, the relevant state court did consider the argument, insofar as Simmons alleged that there was no evidence to support the jury's verdict on this aggravator.  The State concedes that this issue is properly before this Court on habeas review.

This particular aggravating circumstance – that a defendant knowingly created a great risk of death to many persons – has not been widely used in Mississippi, although similarly-worded statutes have been employed in other states.  Depending upon the wording of those statutes, they require actual injury or an actual threat to persons other than the primary victim.  The aggravating circumstance cannot be argued in some states unless the other people were in a "zone of danger."  As recognized in *Jackson v. State*, 684 So. 2d 1213, 1234 (Miss. 1996), "[o]ther jurisdictions, in determining the applicability of this particular aggravator, have reached results as various as the circumstances of the individual case, colored by statutory language, the nature of the weapon used, and the number and location of the victims."  One commentator has summarized the application in other jurisdictions as follows:

A foreseeable risk of death or injury to others, within the contemplation of a statutory aggravating circumstance, has been found inherent in the particular means of killing employed or the manner or place in which the murderous act was committed, such as shooting repeatedly in a crowded room or public area, placing a bomb, designed to explode when moved, on the porch of an occupied dwelling located in a residential area, or putting a highly toxic drug into beverages in a family's refrigerator.  Risk to others may also be inferred from acts independent of those causing death but committed in the same course of conduct, even where the fatal acts themselves would not normally be considered hazardous to anyone but the victim, such as driving erratically down a crowded highway while struggling with and just before or while fatally beating and strangling the victim, or by setting fire to the victim's bed after fatally strangling him in an apartment building occupied by several other people at the time of the arson.  A finding that the defendant knowingly created a great risk to others may be based not only on the dangerousness inherent in the nature of the fatal act or collateral acts, but also on the immediate and foreseeable consequences of the killing itself. . . .

In many cases, the courts have held the evidence insufficient to establish as a statutory aggravating circumstance that in committing the murder, the defendant created a risk of death or injury to more than one person, to many persons, and the like, because the elements of knowing or intentional creation of the risk, probability or high likelihood of the risk, or proximity of persons other than the murder victim to the time and place of the killing were not satisfied.

Thomas M. Fleming, Annotation, *Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that in Committing Murder, Defendant Created Risk of Death or Injury to More than One Person, to Many Persons, and the Like – Post-Gregg Cases*, 64 ALR4th 837 (1988).

The Mississippi Supreme Court has held that the application of this section is not limited to situations where large numbers of persons were unintentionally placed in danger.  *Jackson*, 684 So. 2d at 1235.  The court has found the aggravator valid in cases where there were multiple victims. *McGilberry v. State*, 843 So. 2d 21, 29 (Miss. 2003); *Jackson*, 684 So. 2d at 1235.  It has also been approved in cases where shots were fired in an area in which it was possible to hit bystanders.  *Snow v. State*, 875 So. 2d 188, 194 (Miss. 2004); *Flowers v. State*, 842 So. 2d 531, 563 (Miss. 2003); *Wheeler v. State*, 536 So. 2d 1341, 1344 (Miss. 1988).  The court has held it invalid, however, where

the evidence clearly showed that the defendant fired exclusively at his victim at close range, on grounds that there was no *knowing* risk to others.  *Porter v. State*, 732 So. 2d 899, 905 (Miss. 1999).

The prosecutors' theory at trial was that Simmons created a great risk of death to one other person – Charlene Leaser.  The evidence supporting that theory was Leaser's testimony regarding the events that took place after she was restrained in the metal box, including Simmons's retrieving her belongings from the motel.  The State advanced this position both during its closing after the guilt phase and during its closing after the penalty phase.   On appeal, Simmons argued that, even if Leaser had been placed at a great risk of death, two people were not "many."  The State then responded that the great risk was created by the repeated firing of a rifle in the still of the night in a residential neighborhood.  The Mississippi Supreme Court discounted this first argument, holding that the only people in danger were Wolfe, Leaser, and Simmons, who, it held, did not "constitute 'many' people for purposes of the statutory language."  *Simmons*, 805 So. 2d at 496.  Alternatively, the State contended that Simmons contaminated the recreational waters of this residential neighborhood with Wolfe's body parts, and that his actions were intended to attract feeding alligators to the bayou, which was used by the adjoining landowners for recreational purposes.   The court accepted this second argument, making the following findings:

> Simmons contaminated the recreational waters of the residential neighborhood with Wolfe's remains, much of which was not recovered by police.  These actions were intended to attract alligators and other similar creatures in an effort to use what nature had to offer to dispose of the evidence.  Adjoining landowners and other water enthusiasts were subjected to this inherent danger as a direct result of Simmons's actions.  In addition, all of those residents who used that water as it carried the solid and liquid remains of Wolfe through tributaries into the Gulf of Mexico were subjected to this toxic mixture as well.

*Id*.

In his state petition for post-conviction relief, Simmons re-argued his original position on direct appeal, and also asserted that the court's opinion amounted to appellate fact-finding or re-weighing. The court rejected each of these arguments, relying on res judicata. The court disagreed with Simmons's contention that it had engaged in appellate fact-finding or re-weighing, holding that the court had merely reviewed the record and held that the evidence was sufficient to support the jury's verdict. *Simmons v. State*, 869 So. 2d 995, 1006 (2004).

In his habeas petition in this Court, Simmons maintains that there was insufficient evidentiary support for the verdict on this aggravator. In Mississippi, the statutory language for this aggravator requires that the defendant "knowingly created a great risk of *death* to many persons." Miss. Code Ann. § 99-19-101(5) (c) (emphasis added). Petitioner asserts that the Mississippi Supreme Court's opinion referred to Simmons's "intent," as well as a risk of "harm" or "inherent danger," thus analyzing the issue under different, and arguably less restrictive, language than that actually contained in the statute.

On habeas review, a federal court defers to the state court's decision regarding factual determinations. The state court's individual factual determinations are *presumed correct*, and that presumption can only be rebutted by *clear and convincing* evidence. 28 U.S.C. § 2254 (e)(1) (emphasis added). Moreover, habeas relief will only be granted on factual claims where the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The United States Supreme Court has stated that, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In *Miller-El*, the Court mandated further review of a claim of

16

racially discriminatory jury selection practices by the Office of the Dallas County District Attorney. When Miller-El's claim came back before the Court, its second opinion characterized this standard of review as "demanding but not insatiable . . . ." *Miller-El v. Cockrell*, 545 U.S. 231, 240 (2005). Ultimately, the Supreme Court found the state court's factual findings to be unsupported by the record and its decision unreasonable. The Mississippi Supreme Court's findings, as quoted earlier, can be analyzed with reference to the testimony that the jury heard in Simmons's trial.

### a. Simmons contaminated the recreational waters of the residential neighborhood with Wolfe's remains, much of which was not recovered by police.

There is little doubt that Simmons threw Wolfe's body parts into the bayou, for the purpose of avoiding discovery of the murder. Dr. Paul McGarry, who assisted in recovery of Wolfe's body parts and performed the autopsy on them, testified that the head had been removed and the finger and toe pads slashed, indicating an intent to preclude identification. Dr. McGarry testified that about one hundred fifty pounds of body parts were recovered over a period of three days, and that he did not believe that this constituted all of Wolfe's body. Melissa Schoene, of the State Crime Lab, testified that a pair of blue jeans, cut along the left outside seam from cuff to waist, were recovered from Simmons's home. Those pants were size 30 waist, 34 inseam, indicating a man who did not likely weigh much more than 150 pounds. According to the Petition, Charlene Leaser told police investigators that Wolfe weighed 137 pounds. (An excerpt from that statement was attached to the Petition; however, this information does not appear in the record.) The record does not support the finding that "much" of Wolfe's body was not recovered; however, there is sufficient evidence that much of the body was in the bayou for several hours and that some of it was in the bayou for up to three days. Some of the body was never recovered. To the extent that Wolfe's remains could or may

have attracted alligators or exuded any pollutants during this time, the jury could have reasonably concluded that Simmons "contaminated" the bayou.

**b. These actions were intended to attract alligators and other similar creatures in an effort to use what nature had to offer to dispose of the evidence**.

There was substantial testimony at trial as to the presence of alligators in the bayou – much of it presented by the defense. This testimony was apparently offered to establish that Simmons did not take his knives home in preparation for killing and disposing of Wolfe, but in anticipation of hunting alligators on the bayou. Rita Taylor recounted an incident where she purposely attracted an alligator for Simmons to shoot by splashing her feet in the water as she was sitting on the dock. Donald Taylor testified that he and Simmons had general conversations about alligators and fishing. Charles Jenkins, Simmons's co-worker, was questioned extensively during cross-examination about whether Simmons intended to skin an alligator on the night he took his knives home. Lee Merrill stated that he had heard there were alligators in the bayou, and that he had seen one. However, there was also substantial evidence introduced from which the jury could have concluded that Simmons planned and directed this murder and the disposal of the body. Based on the totality of the record, a reasonable juror could easily have discredited Simmons's argument and then concluded that Simmons intended to dispose of Wolfe's body in the bayou so that alligators would eat it, thereby disposing of evidence.

**c. Adjoining landowners and other water enthusiasts were subjected to this inherent danger as a direct result of Simmons's actions.**

There is little direct evidence in the record addressing the existence of adjoining landowners or other water enthusiasts, or as to the course of the bayou. During the testimony in this case, several witnesses testified by reference to two aerial photographs of the scene. Because these photographs

have not been provided to the Court, it is difficult to tell from the record the direction of the bayou's flow. However, the deed to Simmons's property was attached to a Motion to Exclude Evidence that was filed prior to trial. That deed shows that Simmons's property was on the north side of Gregory Street, bounded on the west by a body of water called "Six Mile Branch."

Prior to trial, Lee Merrill testified at a hearing on the Motion to Exclude, during which he was asked about the flow of the bayou; he testified that it flowed "up" toward a paper mill canal. Photographs submitted as exhibits to Simmons's post-conviction proceedings, which may have been copies of the aerial photographs used at trial, indicate that the bayou runs through a wooded, unpopulated area. Some of Simmons's neighbors testified at trial – Don and Rita Taylor and Debbie Seab. They testified that they lived across Gregory Street from Simmons, which would mean that both families were on the south side of the street. Apparently, the Taylors were directly across from Simmons, since the bayou also ran by their home. Rita Taylor agreed with the prosecutor that it was a "somewhat rural neighborhood."

Simmons's intent to dispose of Wolfe's remains in a body of water containing alligators would nevertheless satisfy the terms of the statute, which required that he "knowingly created a great risk of death to many persons." The fact that officials retrieved most of Simmons's body, but were still finding body parts in the bayou two days later, and never found all of them, would show that such a risk was created. Lee Merrill testified that the body parts were found north of Simmons's residence, which would be a normal result of the water's flow in that direction. It would certainly have been within the realm of the jury's common understanding to conclude that the disposal of Wolfe's body parts in the bayou would attract wild animals, such as alligators, and that the adjoining landowners or other water enthusiasts in the general public, might use the bayou for recreation, just

19

as they would any other body of water.  A rational jury could reasonably find that attracting feeding, wild animals to an area likely frequented by human beings created a great risk of death to many people.  Simmons has not rebutted the state court's findings with clear and convincing evidence on this issue.

>    **d.  In addition, all of those residents who used that water as it carried the solid and liquid remains of Wolfe through tributaries into the Gulf of Mexico were subjected to this toxic mixture as well.**

Although Wolfe's body parts contaminated the water for some period of time, there is insufficient evidence in the record to support the conclusion that the disposal of Wolfe's body created a "toxic mixture."  Simmons attached to his Petition some affidavits concluding that such a mixture was not created, noting that large animals sometimes die or are discarded in such bodies of water, with no ill effects to the people who live nearby.  However, that evidence was not available to the state court and cannot be considered here.  Nevertheless, the prosecution offered no testimony as to the toxic effect of disposal of human remains on adjoining landowners or other users of the water.

Longstanding United States Supreme Court precedent holds that a complete absence of evidence to support a verdict is grounds for vacating that judgment.  *Thompson v. Louisville*, 362 U.S. 199, 206 (1960).   Under more recent Supreme Court precedent, there must be more than a "modicum" of evidence to survive  habeas review.  *Jackson v. Virginia*, 443 U.S. 307, 320 (1979). Thus, even taking into account the presumption of correctness accorded to state court findings by § 2254(e)(1), a petitioner is entitled to habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable

doubt." *Id*. at 324.  The same test applies to the review of the jury's finding of an aggravating circumstance.  *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990).

Simmons argues that the State did not establish at trial that he knowingly created a great risk of death to many persons to the extent that a rational trier of fact could have found proof of the aggravator beyond a reasonable doubt.  The Court disagrees.  Simmons cannot overcome the deferential standard of review that this Court must employ in a habeas case.  Considering the totality of the relevant evidence that the State presented, this Court cannot conclude that no rational trier of fact could have found that Simmons's disposal of Wolfe's body created a great risk of death to many persons, or that the correctness of the state court's factual determinations has been rebutted by clear and convincing evidence.  In any event, even if the Court accepted Simmons's position and invalidated this aggravator, that result would not help him, because the evidence presented on this issue could properly have been considered by the jury to find the other aggravating circumstance.

Formerly, United States Supreme Court precedent distinguished between "weighing" and "non-weighing" states to determine the effect of an invalid aggravator.  In a weighing state, the factors that make a defendant eligible for the death penalty are the same factors that are used to determine whether a sentence of death is appropriate in that case, and the jury weighs only those statutory factors against any evidence it deems to be mitigating.  *Stringer v. State*, 503 U.S. 222, 229 (1992).  Mississippi is a weighing state.  *Id*.  In a non-weighing state, an aggravating factor must be found before the jury can consider imposing death, but aggravating factors have no specific role in determining the appropriate sentence.  *Id*. at 229-30.  In Georgia, which is a non-weighing state, the jury is permitted to consider all circumstances relevant to both the offense and the defendant.  *Zant v. Stephens*, 462 U.S. 862, 872 (1983).  Prior United States Supreme Court precedent recognized the

distinction between weighing and non-weighing states, and the Court did not require harmless error analysis to be performed in cases from non-weighing states, so long as at least one aggravator remained to make the defendant death-eligible. *Stringer,* 503 U.S. at 229*; Zant*, 462 U.S. at 890.

Where an aggravating circumstance was held to be invalid in a weighing state, however, prior law required that the remaining aggravators be re-weighed against the mitigating evidence. *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990). That re-weighing could be performed by either the trial court or an appellate court *of the state*. Federal courts could not re-weigh the factors. *Richmond v. Lewis*, 506 U.S. 40, 49 (1992) ("Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus, if the sentence is to stand."). As an alternative to re-weighing, the state court may also perform a harmless error analysis. *Clemons*, 494 U.S. at 753-54. While never expressly addressed by the Supreme Court, several of the Circuit Courts of Appeals have held that federal courts may also conduct a harmless error analysis, even where the state court did not. *Jennings v. McDonough*, 490 F.3d 1230, 1252 (11th Cir. 2007) ("By our count, five circuit courts of appeals have authorized such an approach."). The Fifth Circuit is among them. *Nixon v. Epps*, 405 F.3d 318, 331-32 (5th Cir. 2005); *Billiot v. Puckett*, 135 F.3d 311, 319 (5th Cir. 1998). Under this precedent, if this Court were to invalidate the "great risk of death" aggravator in Simmons's case, habeas relief would be required, so that the state court could re-weigh the aggravating and mitigating circumstances, unless this Court held that the error was harmless.

However, in 2006, after the briefs were submitted in this case, the Supreme Court decided *Brown v. Sanders*, 546 U.S. 212 (2006). The case came to the Court to review the partial grant of habeas relief in California, a non-weighing state. The Court discussed the history of its distinction

22

between weighing and non-weighing states – terminology that it described as "misleading." *Id.* at

216.  According to the Court, all states require some form of "weighing," and the existing law did

not distinguish between the treatment accorded to a case where an "eligibility" factor rather than an

"aggravating" factor was invalidated.[1]  Finding that the scheme was "needlessly complex and

incapable of providing for the full range of possible variations," the Court determined that the

difference in treatment was unnecessary, stating:

> We think it will clarify the analysis, and simplify the sentence-invalidating factors we have hitherto applied to non-weighing States . . . . if we are henceforth guided by the following rule: An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

*Id.* at 220.

The Court went on to explain that the test was not based on the *admissibility* of the

underlying evidence, but whether the evidence could have been given aggravating weight under a

valid sentencing factor.  *Id.* at 220-21.  The Fifth Circuit has not had occasion to consider *Brown* and

---

[1]For example, although Mississippi has historically been considered a "weighing" state by the Court, different statutes supply the eligibility and aggravating factors.  Miss. Code Ann. §§ 97-3-19; 99-19-101(5)(h) (1972).  The eligibility factors are those that raise the crime of murder to capital murder and are considered at the guilt phase; the aggravating factors are those that the jury considers at the sentencing phase to determine whether a defendant convicted of capital murder should be sentenced to death.  Although the factors are similar, they are not the same.  Because at least one aggravator must be found to impose the death penalty, *Brown* determined that Mississippi's aggravators were "de facto" eligibility factors.  *Brown*, 546 U.S. at 220 n.5.  The myriad of statutory schemes for death penalty sentencing defies characterization under the weighing/non-weighing paradigm, and even Justice Breyer's dissent approved of its elimination.  *Id.* at 234-35 (Breyer, J., dissenting).

its effect on cases within its jurisdiction, particularly Mississippi,[2] and the parties to this case have not briefed its effect on this matter.  Clearly, if the Mississippi Supreme Court had invalidated the aggravator and then failed to remand the case or re-weigh the factors itself, the review under habeas standards would determine whether that decision was an unreasonable application of federal law. The applicable law would be *Stringer*, since *Brown* had not been decided at that time.  *Hooper v. Schriro*, No. CV 98-2164-PHX-SMM, 2007 WL 1795813 (D. Ariz. June 21, 2007).

Here, however, the state court refused to invalidate the aggravator, and the question becomes whether this Court would be required to grant habeas relief, if it had accepted Simmons's position and invalidated the aggravator.  *Brown* appears to hold that it is not necessary for a federal court to grant habeas relief, if it determines that the evidentiary basis for the aggravator could be used to support another, valid aggravating circumstance.  This Court must determine whether *Brown*, decided after Simmons's trial, should be applied to this case, whether *Brown* applies in cases from weighing states, and whether *Brown* has any effect on this Court's ability to perform harmless error analysis.

Other federal courts that have reviewed *Brown* have taken different viewpoints on its application.  It has already been applied to a case from Missouri, a non-weighing state.  *Clayton v. Roper*, 515 F.3d 784, 792 (8th Cir. 2008).  The Sixth Circuit, however, has declared that the rule announced in *Brown*, "apparently modifies the analysis for non-weighing States, but leaves intact the Court's prior jurisprudence regarding weighing states."  *Wilson v. Mitchell*, 498 F.3d 491, 507 (6th Cir. 2008).  In Ohio, a weighing state, one district judge has ruled that *Brown* does not apply

---

[2]The Fifth Circuit mentioned *Brown* in a recent opinion, but only to point out that it was inapposite to the facts presented and that the petitioner's reliance on it was misplaced.  *Hughes v. Quarterman*, 530 F.3d 336, 346 (5th Cir. 2008).

to weighing states. *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 787 n.6 (N.D. Ohio 2007) (J. Katz). Another judge reached the opposite conclusion, holding that the decision in *Brown* abrogated the *Stringer* test, but held that its application "does little to alter" the  argument that re-weighing is required. *Eley v. Bagley*, No. 4:02cv1994, 2006 WL 2990520 at *14 n.17 (N.D. Ohio Oct. 18, 2006) (J. Boyko).  Given the language of the Supreme Court's opinion announcing that it was eliminating the dichotomy between weighing and non-weighing states, the Court is persuaded that the Supreme Court intended that *Brown*'s rationale apply to both.  Since there is no legal impediment to applying its teachings to Simmons's case, it should be analyzed under *Brown*.

Under *Brown*, this Court must determine whether evidence submitted to support an invalid aggravator could have been considered in support of the only other aggravating circumstance or eligibility factor.  Here, the motivation for Wolfe's murder was avoidance of a drug debt, which, as the jury was instructed and as it ultimately concluded, amounted to pecuniary gain.  The evidence also showed that Wolfe's and Leaser's money and other personal belongings were taken, and that Simmons was disappointed that he did not find more money on Wolfe after he was murdered.  The evidence presented at trial in support of the "great risk" argument also related to Leaser's experience after the shooting, during which time she was restrained and her belongings were taken from her. All of this evidence supports the pecuniary gain aggravator.

As for the evidence that was produced to support the Mississippi Supreme Court's view of the aggravator, this included evidence concerning the disposal of Wolfe's body in the bayou, specifically testimony regarding the presence of alligators, the existence of an adjoining landowner, and the use of the waterway to fish.  This evidence was relevant to the planning and execution of the plot to kill Wolfe to extinguish a debt, deprive him of his money, and hide the evidence of that

crime.  This evidence further supported the charges of robbery or pecuniary gain.  It could properly have been given "aggravating weight" by the jury.  *See Brown*, 546 U.S. at 221.  Thus, even if the "great risk" aggravator was invalid, under *Brown* constitutional error was not committed by considering this evidence as an aggravating factor to support the imposition of the death penalty.

2.      **The Death Penalty As Applied in Petitioner's Case is Disproportionate and in Violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

There is no dispute in this case that Timothy Milano, who was also convicted of capital murder, but did not receive the death penalty, fired the shots that killed Jeffrey Wolfe.  The reason for the difference in sentence may not appear solely in this record.  At Simmons's trial, the evidence suggested that both Timothy Milano and Simmons owed drug money to Wolfe and that both men participated in dismembering Wolfe's body.  Although Timothy was called as a witness for Simmons, he refused to testify, invoking the Fifth Amendment.  In his own trial, however, Timothy testified that the drug debt was entirely Simmons's, that Simmons actually shot Wolfe, and that he waited in the living room while Simmons dismembered Wolfe's body.  Timothy also indicated that he had acted under duress.  *See Milano v. State*, 790 So. 2d 179 (Miss. 2001).  These contentions may have persuaded the jury to reject the death penalty as the appropriate sentence for Timothy.

The record in this case shows that Simmons and Timothy were former brothers-in-law; Simmons had recently been divorced by his wife (Milano's sister), but they apparently maintained some sort of relationship.  A newspaper article submitted by Simmons in support of his Memorandum states that he was thirty-three at the time of the murder, while Timothy was only twenty-one.  The evidence in this case also casts Simmons in the position of leadership in this crime.  On the day that Wolfe and Leaser arrived in Mississippi, Simmons took the unusual step of taking

his knives home from his job as a butcher.  He borrowed a boat from a neighbor.  Simmons did not

arrive at his home until late in the evening, when Sonny Milano found him there and told him that

Wolfe had arrived.  At that point, around midnight,  Simmons instructed him to call Wolfe at his

motel and invite him over.  Then Simmons asked Sonny to leave.

Leaser testified that Sonny's house was full of weapons, and there is no indication that

Timothy had a rifle with him when he returned to Simmons's house from Sonny's.  After Timothy

shot Wolfe, Simmons informed Leaser that he "was on a time frame" and could not "mess up."

When Simmons  took Leaser out of the metal box to rape her, he was naked and looked as if he had

just showered.  Leaser testified that he had a gun in his hand, and he told her that her life depended

upon her performance.  Timothy remained in the living room, and did not rape Leaser.  A neighbor

saw Simmons and Timothy carrying buckets to the bayou in the early morning hours.  Simmons later

told his friend that he had "whacked a drug dealer," cut up his body, and thrown him into the bayou.

The evidence in Simmons's case indicates that he was the planner and the ringleader in the killing

and was primarily responsible for disposing of the body.  The evidence in Timothy's case could have

convinced the jury that Timothy was less culpable and was under Simmons's domination and

control.  The jury in Timothy's case might have also believed his testimony that he was not the

shooter.

During the guilt phase of Simmons's trial, the jury was instructed that intent "implies purpose

to do an act."  They were also told that "one who willfully, unlawfully and feloniously aids or abets,

assists or otherwise encourages the commission of a crime is just as guilty under the law as if he or

she had committed the whole crime with his or her own hands."  They were later instructed that, in

order to convict Simmons of capital murder, they had to make the following findings:

27

(1) the incident in this case occurred on or about August the 13, 1996 in Jackson County, Mississippi; (2) Jeffrey Wolfe was a living human being; (3) the Defendant alone or in conjunction with another did willfully, unlawfully and feloniously shoot and murder Jeffrey Wolfe with a firearm with or without deliberate design and said shooting resulted in the death of Jeffrey Wolfe; and (4) that the killing of Jeffrey Wolfe occurred while the Defendant was in the process of committing the crime of robbery as defined in the other instructions given to you by the Court . . . .

Instruction S-6, C.P. 166.

Later, during the sentencing phase, the jury was instructed that, in order to return a verdict of death, they must find at least one of the four factors mandated by *Enmund v. Florida*, 458 U.S. 782 (1982):

1.      The defendant actually killed;

2.      The defendant attempted to kill;

3.      The defendant intended that a killing take place; or

4.      The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7) (1972).

The jury found that Simmons intended that the killing take place and that he contemplated that lethal force would be employed.  Simmons now asserts that the later case of *Tison v. Arizona*, 481 U.S. 137 (1987), announced additional findings that must be made before a non-triggerman can be put to death.  Because those findings were not made, Simmons maintains that it was a violation of clearly established federal law to sentence him to death when Wolfe's actual killer received a life sentence.

Simmons's proportionality argument is divided into three parts: (1) that the jury did not find a specific intent to kill; (2) that the additional findings imposed by *Tison* were not made by the jury, nor was the jury properly instructed under the law of *Enmund* and *Tison*; and (3) that the sentence

28

is generally disproportionate.  The Respondents argue that the *Enmund/Tison* argument was not presented by Simmons to the state court, and is, therefore, procedurally barred from consideration, as well as non-meritorious.  A habeas claim that was not raised in state court has not been properly exhausted; all applicants seeking federal habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim.  *Williams v. Taylor*, 529 U.S. 420, 429-30 (2000).  That presentation must also alert the state court to the legal basis for the claim.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

In his appellate brief to the Mississippi Supreme Court, Simmons primarily addressed the issue of whether it is constitutional to subject a defendant to the death penalty when he was involved in a capital murder without intent to kill, while providing a lesser punishment to a person who committed a simple murder with intent.  While he cited *Enmund* and *Tison*, he did not advance the particular argument made here – that *Tison* added elements to the *Enmund* findings that a jury must find to impose the death penalty.  The court did not address the intent argument, nor did it mention *Tison* or *Enmund*, although it did hold that the death penalty was not disproportionate for Simmons, finding that there was "ample evidence to show that he did have an active role in planning and participating in the robbery and murder."  *Simmons v. State*, 805 So. 2d 452, 507 (Miss. 2002).  In the pleadings supporting his state petition for post-conviction relief, Simmons argued that he was merely an aider and abettor, and could not receive the death penalty pursuant to *Enmund*.  While he

29

cited *Tison* in support of his general proportionality theory, he did not advance the position about its effect that he presents to this Court.  The Mississippi Supreme Court rejected his argument, citing neither *Enmund* nor *Tison*.  *Simmons v. State*, 869 So. 2d 995, 1007-08 (Miss. 2004).

The Respondents here argue that Simmons failed to "fairly present" his claims on this issue – the impact of *Tison* on the required *Enmund* findings – and is therefore procedurally barred from pursuing the matter in this Court.  The law requires Simmons to present to the state court the "controlling legal principles" that he believes apply to the facts of his case.  *Picard v. Connor*, 404 U.S. 270, 277 (1971).  In *Picard*, the petitioner's claim was defaulted because his state court claims were based on state law, with only a passing reference to the Fourteenth Amendment, while he relied on the Equal Protection Clause in his habeas petition.  Later, in *Anderson v. Harless*, 459 U.S. 4, 7 (1982), the Court dismissed a habeas claim on the constitutionality of a malice instruction given at trial.  Because the petitioner had only argued his claim under state law in state court, he could not support a due process claim under federal law in his habeas pleadings.  *See id.; also Howell v. Mississippi*, 543 U.S. 440, 444 (2005) (holding that a litigant could raise a federal issue by simply labeling the claim "federal"); *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  Similarly, the Fifth Circuit has barred a habeas claim for ineffective assistance of counsel where the petitioner argued ineffectiveness at the mitigation stage of his trial to the state courts, but added a claim of ineffectiveness during voir dire and closing argument to his habeas petition.  *Ries v. Quarterman*, 522 F.3d 517, 525 (5th Cir. 2008).

In a case somewhat similar to Simmons's, the Fifth Circuit dismissed a habeas claim raising the exclusion of an exculpatory statement at trial.  *Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001).  Wilder's state court arguments were predicated on state evidentiary rules, only mentioning

the Fifth and Fourteenth Amendments.  In his state post-conviction proceedings, he made a brief reference to the case of *Chambers v. Mississippi*, 410 U.S. 284 (1973).  After he filed his federal habeas petition, the district court, apparently *sua sponte*, applied *Chambers* to hold that the exculpatory statement should have been admitted.  The Fifth Circuit reversed, holding that the *Chambers* claim had not been exhausted in state court.  In so doing, the court noted that the claims presented in state court were legally, logically, and mechanically distinct.  Wilder's habeas petition was dismissed.  *Wilder*, 274 F.3d at 261-62.

Here, the question is closer.  Simmons cited *Enmund* and *Tison* and discussed them in the state court proceedings, although not as extensively, and not in entirely the same manner, as he does before this Court.  While *Wilder* provides some support for the Respondents' exhaustion argument, barring Simmons's claim may go too far.  His other arguments – general proportionality and the question of intent – were exhausted and need to be addressed.  Therefore, it appears that the most prudent course is to address the proportionality claims on their merits.

In both *Enmund* and *Tison*,  the issue was whether the defendants had the requisite intent that a murder take place to warrant the death penalty.  *Enmund* involved the imposition of the death penalty on a driver for a couple who committed two murders in the course of an armed robbery.  The driver, Enmund, was not actually at the scene of the killings; instead, he was waiting in the getaway vehicle.  Although finding no more than an inference that Enmund drove the getaway car, the Florida Supreme Court found this sufficient to support a verdict that he aided and abetted in the robbery and could therefore be convicted of felony murder and sentenced to death.  *Enmund*, 458 U.S. at 786.  The United States Supreme Court disagreed.  Holding that the evidence did not support a finding that Enmund intended more than to participate in a robbery, the Court reversed his sentence and

announced that at least one of the four factors noted above, and now codified at Miss. Code Ann. § 99-19-101(7),  must be present to justify the death penalty.  *Id*. at 797.

In *Tison*, three brothers had assisted in breaking their father and another man out of prison. In the course of the escape, their vehicle  had a blow out and they flagged down a family for assistance.  The brothers' father and the other prisoner shot the family to death.  *Tison*, 481 U.S. at 141.  Two of the brothers were convicted of capital murder (their father escaped during a gunfight with police, but died of exposure in the desert; the third brother died in the gunfight; and the other prisoner was sentenced to death and ultimately executed), and the Arizona Supreme Court affirmed their convictions and sentences.  *State v. Tison*, 633 P.2d 335 (1981).  After re-considering the case, the court once more affirmed, noting that the brothers provided the murder weapons, helped to abduct the victims, were present at the murder site, did nothing to interfere with the murders, and continued, after the murders, on their joint venture.  *State v. Tison*, 690 P.2d 755 (1984).

The United States Supreme Court recognized that the Tison brothers' case did not fit within the "intent to kill" category of murders for which *Enmund* explicitly found the death penalty permissible.  *Tison*, 481 U.S. at 151.  On the other hand, after analyzing the facts, the Court held that the Tison brothers' case did not fall within the category of cases for which *Enmund* found the death penalty disproportionate.  In so doing, the Court found that the Tisons' "degree of participation in the crimes was major rather than minor, and the record would support a finding of the culpable mental state of reckless indifference to human life."  *Id*.  The Court's specific findings are important, as they are not dissimilar from Simmons's participation in Wolfe's killing:

> Raymond Tison brought an arsenal of lethal weapons into the Arizona State Prison which he then handed over to two convicted murderers, one of whom he knew had killed a prison guard in the course of a previous escape attempt.  By his own

admission he was prepared to kill in furtherance of the prison break. He performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed. He robbed these people at their direction and then guarded the victims at gunpoint while they considered what next to do. He stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. Instead, he chose to assist the killers in their continuing criminal endeavors, ending in a gun battle with the police in the final showdown.

Ricky Tison's behavior differs in slight details only. Like Raymond, he intentionally brought the guns into the prison to arm the murderers. He could have foreseen that lethal force might be used, particularly since he knew that his father's previous escape attempt had resulted in murder. He, too, participated fully in the kidnaping and robbery and watched the killing, after which he chose to aid those whom he had placed in the position to kill rather than their victims.

*Id*. at 151-52.

These factors made the Tisons' participation in the murders "anything but minor," and the Court accepted that "they both subjectively appreciated that their acts were likely to result in the taking of innocent life." *Id*. Thus, the issue before the Court was whether the death penalty was appropriate in such an "intermediate" case.

The Court concluded that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state . . . that may be taken into account in making a capital sentencing judgment . . . ." *Id*. at 157. Unlike Enmund, who was sitting in a car at a location remote from the murders, the Tisons were "actively involved" in every element of the kidnaping, robbery, and murder, as well as the subsequent flight. The Court ultimately held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id*. at 158. Because the Arizona court had already determined that the first element existed, the Court remanded for a determination of the second element.

Simmons reads *Tison* as engrafting two additional findings that must be made where a defendant neither killed nor attempted to kill. Because the jury did not make these findings, he argues that he is entitled to habeas relief. Moreover, he contends that the findings cannot be made by a reviewing court, under the teachings of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).[3] Thus, Simmons insists, his case must be returned to the trial court for a determination on the *Tison* findings.

Simmons's re-fashioned habeas argument rests on two faulty premises – (1) that the only relevant jury instruction given during the guilt phase was the aiding and abetting instruction; and (2) that there was no evidence that Simmons "participated" in the murder. A review of the complete set of jury instructions given in the case demonstrates that the jury was also told that they could only find Simmons guilty of capital murder if he "did willfully, unlawfully and feloniously shoot and murder Jeffrey Wolfe with a firearm with or without deliberate design . . . ." Thus, the jury had to find Simmons guilty of aiding, abetting, assisting or encouraging the actual shooting, and this was the theory of the case presented to the jury during the guilt phase. This is a far different situation than *Enmund* or *Tison*, where the death penalty could have been imposed for participating only in the underlying offenses of robbery or kidnaping, without knowledge that a murder was planned or specific intent to participate in it.

In returning a guilty verdict on the charge of capital murder, the jury necessarily found that Simmons participated in Wolfe's shooting. The evidence that Simmons planned the murders, enticed the victim to his home late in the evening, supplied the murder weapon, and disposed of the

---

[3]Although the Respondents argued in state court that these cases would not apply retroactively to Simmons's case, that position appears to be incorrect. The United States Supreme Court denied Simmons's petition for certiorari about four months after *Ring* was decided.

body supported that finding.  The jury further found during the sentencing phase that Simmons

intended that Wolfe's killing take place and contemplated that lethal force would be employed.

These findings are amply supported by the record, which contains facts far more incriminating even

than those of *Tison*, where the Supreme Court found that the death penalty could be imposed.  Given

these findings, the jury was not required to do more.  The Fifth Circuit said as much in *Foster v.

Quarterman*, 466 F.3d 359, 369 (5th Cir. 2006), holding that, where the facts supported a jury

finding that the defendant anticipated that a life would be taken, there was no need for further

findings.  Expounding on that decision in a later case, a Texas district court held that a jury's

determination  that a defendant anticipated the victim's death "meets, if not surpasses, the moral-

culpability threshold of 'reckless indifference to human life' under *Tison*."  *Gongora v. Quarterman*,

498 F. Supp. 2d 919, 925 (N.D. Tex. 2007).    The jury in this case concluded that Simmons

participated in Wolfe's murder, that he intended for the murder to occur, and that he intended that

lethal force be used.  The *Tison* elements were satisfied.  The record does not support Simmons's

position that the death penalty is disproportionate in this case, and Simmons is not entitled to relief

on this issue .

**3.      Petitioner Was Denied Effective Assistance of Counsel in Violation of His Sixth
         Amendment Rights As Provided for in the United States Constitution in that He Was
         Deprived of the Effective Assistance of Counsel at the Penalty Stage of the Trial, in
         Particular, that the Mitigation Case, Such As it Was, Clearly Fell Beneath Then-
         Prevailing Norms of Practice.**

Simmons alleges that his attorneys were deficient in their presentation of a mitigation case

during the sentencing phase of his trial.  During that phase, six people testified on Simmons's behalf;

all of them asked the jury to spare his life.  A summary of their testimony follows:

**a.   Jewell Simmons**.   Mrs. Simmons was Simmons's paternal grandmother.  She told the jury that Simmons was a "nice boy," a good father, a loving husband, and a hard worker who had held two jobs to provide for his family.  She also mentioned that two of her four boys had been murdered, although she testified that she had forgiven the people who killed her sons.

**b.   Milton Dupuis**.  Dupuis was Simmons's half brother; he and Simmons have the same mother.  They spent some of their childhood in the same household, which Dupuis testified was a "very disturbed environment."  Dupuis related that his father beat them every day and also beat their mother, and once shot at Simmons for trying to defend his mother.  When asked about Simmons's adult home, Dupuis described it as stable and Simmons as a hard worker.  Dupuis said that Simmons was responsible for his finding the Holy Ghost, but that Simmons lost some of his religious enthusiasm after his divorce.

**c.   Dana Van Zante**.   Van Zante and her husband were family friends of Simmons and his ex-wife, Lori.  She testified that she had a close relationship with them three or four years prior to the trial, and they had often visited Simmons's home for family cookouts.  Van Zante described Simmons as very polite, a loving husband and a doting father.

**d.   Lynette Holmes**.   Holmes was Lori Simmons's best friend and said that Simmons "would go to the end of the earth" for his wife and children.  Holmes's children considered him their "uncle."  One of the prosecutors cross-examined Holmes, questioning her about Simmons's divorce.  She testified that he had been barred from seeing Lori's two older children, but not his own children.

**e.   Belinda Simmons West**.   West was Simmons's younger half-sister, the daughter of his father.  She grew up in her father's household, while Simmons grew up in his mother's.  After reaching adulthood, they formed a relationship, and she testified that Simmons had been good to her

children, as well as to his own.  She told the jury that she had "never seen a man show such tenderness toward his children as I saw."

**f. Lori Simmons**.  Lori was Simmons's ex-wife, and Timothy and Sonny Milano's sister. She and Simmons were married for about six years, and they had two children together – Heather and Felicia.  She described Simmons as "the hardest working man I know."  Lori had two older children, who were thirteen and eleven at the time of trial.  She divorced Simmons because of allegations made by the older daughter when she was ten years old, although the nature of the allegations was never made clear at trial.  Lori stated that Simmons's greatest joy in life was his two daughters, with whom he had never been denied visitation, and she testified that their life together was middle class and happy.  Lori said that she still loved Simmons and that he talked with her before he turned himself in.  She did not know that Simmons and her brother Timothy were involved in selling drugs.

In his state petition for post-conviction relief, Simmons maintained that his trial counsel was ineffective for failing to conduct an adequate investigation of his childhood.  In particular, he argued that insufficient evidence was presented to the jury regarding his stepfather's abuse and his mother's neglect.  In support of this contention, Simmons offered an affidavit from Tomika Harris, an investigator with the Mississippi Office of Post-Conviction Counsel, who interviewed Jewell Simmons (his grandmother) and Belinda Simmons West (his half-sister).  Although Simmons's father lived with Jewell, he refused to talk with Harris.  Because her son lived with her, Jewell Simmons would not sign an affidavit.

During the conversation with these women, Harris was told that Mildred, Simmons's mother, never attended his trial because she was embarrassed.  Mildred moved to Florida with Simmons

when he was a child, and Jewell rarely got to see him.  They said that Mildred had a gambling problem and would often leave her children home alone while she played bingo, losing the money intended to pay bills and buy food.  Jewell once loaned her money to pay the light bill.  Simmons told Jewell and Belinda that his stepfather was "very mean" to him.

Also offered in support of post-conviction relief was a second affidavit from Tomika Harris.  The affidavit was submitted in support of Simmons's claim, in his supplemental petition, that the trial court had wrongfully limited his ex-wife's mitigation testimony at trial.  In the affidavit, Harris described her attempt to interview Lori Simmons, who had since remarried.  Harris contacted Lori by telephone in April 2003, over five years after the trial.  At that point, Lori stated that she no longer wanted to help Simmons, saying that she had been left by him to raise two children with no help and was just "getting her life in order."

The Mississippi Supreme Court rejected the argument that defense counsel were ineffective for failing to procure a psychological or mitigation expert.  Because Simmons did not raise an insanity defense, his mental condition was not at issue; therefore, the trial court was not obligated to provide him with mental experts.  *Simmons v. State*, 869 So. 2d 995, 1003 (Miss. 2004).  The court found that Simmons had not established that further investigation was necessary, stating:

> Simmons offers no evidence now which supports his claim that his trial counsel should have investigated more thoroughly, or in certain areas, even under the authority he cites.  Simmons offers nothing in support from mental health experts who can now say what an investigation of Simmons or his family background would have shown, or what such experts would now be willing to testify to.  Simmons offers nothing from his trial attorney on how much time he spent preparing for the sentencing phase and why he did not feel the need to offer more or different evidence on mitigation.

*Id*.

38

The court went on to describe Harris's affidavits as hearsay and noted that "some of what is contained in the affidavits was presented at trial." *Id*. at 1004. Based on this review, the court concluded that Simmons had not presented sufficient evidence of a breach of the duty to investigate and present mitigation evidence.

Simmons contends in this Court that his defense attorneys were ineffective in failing to adequately investigate his background in preparation for the penalty phase of the proceedings. These deficiencies caused them to ignore leads that could have developed more substantial evidence of his psychological state, and also caused them to present evidence to the jury that had the effect of damaging his case, such as the claims made by his stepdaughter. In support of these assertions, Simmons has attached new evidence in the form of an affidavit from one of his trial attorneys, Michael Cunningham. It states, in pertinent part:

5.    The affiant would state upon his oath that neither he nor Simmons's co-counsel moved the court for funds to employ an investigator for either the guilt or the penalty phases of trial.

6.    The affiant would state further that no mitigation specialist or other professional was sought to conduct a social psychological inventory of Mr. Simmons to investigate possible mitigation theories.

7.    Neither was the appointment of a psychologist or other mental health professional for any purpose sought or obtained or otherwise used by the defense.

8.    Additionally, the affiant would state that neither he, nor to the best of his knowledge, co-counsel, obtained or reviewed any of Simmons's school records, medical/psychological records, employment records, military records or records dealing with Mr. Simmons's pretrial incarceration in any effort to investigate personal history details that might support a mitigation case, and that no such records were part of the case file.

9.    The affiant would particularly submit that neither he nor Simmons's co-counsel undertook any investigation as to the facts or circumstances of

39

> violent crime affecting Simmons's close personal relatives, such as the murder of two uncles, as described by Jewell Simmons during the trial of the penalty phase of the prosecution.

10.   Similarly, neither he nor, to the best of his knowledge and recollection, did Simmons's co-counsel investigate the details of Simmons's personal childhood violence such as revealed in the testimony of Simmons's half-brother Milton Dupuis, with respect to Simmons's suffering beatings and other violence from his stepfather.

Aff. of R. Michael Cunningham, II, Ex. 8 to Pet'r Br.

In support of his position, Simmons relies heavily on the standard for investigating mitigation evidence announced by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), and *Wiggins v. Smith*, 539 U.S. 510 (2003).  In *Williams*, defense counsel failed to investigate the defendant's childhood, on the mistaken belief that he could only do so by obtaining records that he thought were barred from access by state law.  As a result, counsel neither obtained nor presented evidence showing that the defendant's childhood was "filled with abuse and privation" and that he was borderline mentally retarded.  *Id*. at 398.  Finding that this evidence could reasonably have affected the jury's decision to impose the death penalty, the Court reversed and remanded the case.

In *Wiggins*, counsel focused on their mitigation claim that Wiggins's life should be spared because he was not directly responsible for the murder.  In so doing, the attorneys neglected to present to the jury the following evidence, given at a post-conviction hearing by a licensed social worker:

> According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. [References to the record are omitted throughout.]  Mrs. Wiggins's abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization.  At the

40

age of six, the State placed Wiggins in foster care.  Petitioner's first and second foster mothers abused him physically, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him.  At age 16, petitioner ran away from his foster home and began living on the streets.  He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion.  After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id*. at 516-17.

The Supreme Court analyzed the case under the familiar rationale of *Strickland v. Washington*, 466 U.S. 668, 688 (1984), which requires a court to find both deficient performance and prejudice before granting relief.  Given the strength of the evidence omitted, the Court found that the failure to present it to the jury could not be defended as a strategic decision, but was simply deficient performance.  *Wiggins*, 539 U.S. at 535.  The Court concluded that the failure to present the evidence prejudiced Wiggins, stating, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."  *Id*. at 537.

A few years later, the Court granted relief in *Rompilla v. Beard*, 545 U. S. 374 (2005).  With four justices dissenting, the majority held that trial counsel in a death penalty case was ineffective for failing to review Rompilla's prior conviction file.  The Court reached this conclusion despite finding that defense counsel interviewed the defendant extensively before trial, but found him either disinterested or obstructive  on the issue of providing mitigating evidence.  Defense counsel also spoke with five family members, who failed to provide anything significant to use in his defense.  Three mental health experts were also asked to review Rompilla's mental state at the time of the offense, but they found nothing useful.  *Id*. at 381-82.  In contrast, the prior conviction file contained

an evaluation by a corrections officer who related a troubled childhood and alcohol abuse, as well as test results indicating schizophrenia.  *Id*. at 391-92.  The Court determined that failure to review the file was deficient performance, and the omission of this evidence, as well as other evidence to which the file referred, was prejudicial.  More recently, however, the Court denied relief to a defendant who instructed his counsel that he did not wish to present any mitigating evidence, and, at one point, announced to the court, "I think if you want to give me the death penalty, just bring it right on.  I'm ready for it."  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1938 (2007).  While there was little debate that the actual investigation of mitigating evidence had been deficient, the majority refused to find prejudice, holding that the trial transcript demonstrated that Landrigan "would have undermined the presentation of any mitigating evidence that his attorney might have uncovered." *Id*. at 1941.

As stated earlier, the Mississippi Supreme Court's position on this issue was (1) that Simmons had not presented sufficient evidence of his attorneys' preparation to make out a claim that their performance was deficient; and (2) that he had not shown sufficient evidence of what further investigation would have revealed to make out a claim of prejudice.  Simmons has apparently tried to satisfy the first deficiency by submitting one attorneys' affidavit, both attorneys' time records, the opinion affidavit of a mitigation specialist, a newspaper article containing statements about Simmons's behavior around the time of the crime, and the opinion affidavit of a local attorney with experience in trying death penalty cases.  None of this evidence was presented to the state court.  A petitioner may submit evidence for the first time to a federal habeas court without running afoul of the exhaustion requirement, so long as the new evidence merely supplements his claim, rather than fundamentally altering it.  *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005).  If the evidence puts

42

the petitioner's claim in a "significantly different legal posture," however, it must first be presented to the state court. *Anderson v. Johnson*, 338 F.3d 382, 387 (5th Cir. 2003).

In his state petition for post-conviction relief, Simmons asserted that his trial counsel's investigation had been insufficient, without ever detailing what his counsel had actually done. That omission figured prominently in the Mississippi Supreme Court's denial of relief. "Simmons offers nothing from his trial attorney on how much time he spent preparing for the sentencing phase and why he did not feel the need to offer more or different evidence on mitigation." *Simmons v. State*, 869 So. 2d 995, 1003 (Miss. 2004). By offering this evidence at such a late date, Simmons has arguably placed this claim in a substantially different legal posture, such that he must return to the state court to exhaust it. The Fifth Circuit reached that conclusion in *Diaz v. Quarterman*, where it refused to consider a series of affidavits presented for the first time to the district court. 239 F. App'x 886, 890 (5th Cir. 2007).

Out of an abundance of caution, however, the Court will consider this evidence and address the issue of whether counsel's performance was deficient. The law is clear that an attorney cannot completely fail to investigate mitigating evidence, nor can he claim that failure to investigate was part of his trial strategy if the investigation itself was cursory and unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Here, trial counsel, Michael Cunningham, admits that Simmons's attorneys did not ask for investigative funds; that they did not seek an expert to conduct a "social psychological inventory" of Simmons; that they did not seek the appointment of a mental health professional; that they did not review school records, medical records, employment records, military records or jail records; that they did not investigate the alleged murder of his two uncles; and that they did not investigate the childhood abuse to which Milton Dupuis testified.

However, counsel's affidavit never says that trial counsel failed altogether to investigate Simmons's background.  It also states that Cunningham assisted co-counsel in "interviewing of witnesses and investigation of possible mitigation information."  The attorneys' time records were submitted to substantiate the claim that no time was actually spent preparing a mitigation case, and there are no entries directly to that effect.  The records do not indicate that the attorneys ever met with the individuals who testified in the mitigation case; they do, however, reflect that the attorneys spent over eighteen hours meeting or talking with their client prior to the trial.

In the absence of information showing what the attorneys actually did to prepare to present mitigating evidence, and why they did it, this question is not easy to resolve.  Perhaps Simmons was in contact with all of his witnesses (Lori testified that she visited him in jail), and he relayed their expected testimony to his lawyers.  The record does reflect that Simmons's attorneys asked on the first day of trial that arrangements be made for him to participate in conference calls to the mitigation witnesses, and this request was granted.  On balance, the Court cannot conclude that Simmons has shown that his attorneys' performance was deficient.

Even assuming Simmons could successfully establish that his attorneys' conduct was deficient, he must still demonstrate how he was prejudiced thereby.  In evaluating the prejudice prong of the *Strickland* test, the question is not whether the omitted evidence would have required a change in the outcome of the sentencing hearing, but whether there is a "reasonable probability" that the result of the hearing would have been different if that evidence had been presented to the jury.  *Williams v. Taylor,* 529 U.S. 362, 399 (2000).  The Mississippi Supreme Court held that Simmons was not prejudiced by his counsel's performance.  "To assess prejudice in the capital sentencing context, the court 'reweigh[s] the evidence in aggravation against the totality of the

44

available mitigating evidence.'" *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) (quoting *Wiggins*, 539 U.S. at 534).  Unless Simmons gives the Court the benefit of additional mitigating evidence, there is nothing to re-weigh.

The affidavits attached to Simmons's state post-conviction petition do not provide any such evidence.  The family members told the investigator how much they loved Simmons, that Timothy Milano was the shooter, and that Simmons was a good family man.  All of this evidence was presented at trial.  The Mississippi Supreme Court accorded little weight to this affidavit, on grounds that most of the information was hearsay.  However, the affidavits and other reports considered by the Supreme Court in *Williams, Wiggins,* and *Rompilla* were also primarily hearsay; the point is not whether the information was true, but whether a better investigation by the attorneys would have developed this information.  This Court agrees with the Mississippi Supreme Court's conclusion that much of the information was already before the jury; therefore, its omission could not have been prejudicial.  *Simmons v. State*, 869 So. 2d 995, 1003-04 (Miss. 2004).  Based upon the evidence that the court had before it, this decision was not an unreasonable application of *Strickland* or the cases cited above.  The question becomes what, if anything, should be done with the new evidence presented to this Court.  *Diaz* suggests that it should be ignored.

One piece of new evidence is an affidavit from a social worker, Dr. Gary Mooers, who believes that the information in the post-conviction affidavits, combined with the testimony at trial, "is precisely the sort of detail that – properly investigated – might give rise to the discovery of valid mitigation evidence."  However, the only information of any significance that the jury had not already heard was that Simmons's mother played bingo excessively, sometimes losing money intended to pay bills.  The only privation caused by that gambling was that Simmons's mother once

asked his grandmother for money to pay the light bill.  The Mississippi Supreme Court has already determined that this evidence was not significant, and Dr. Mooers's affidavit should not be used to bring that evidence back for consideration.

Simmons also offers an article published in a local newspaper shortly after the murder, which contains two statements that he believes prove that additional mitigation evidence existed that should have been found.  One part of the article quotes Simmons's former pastor, who said that Simmons came to church a few weeks before Wolfe was killed:

> I didn't recognize him at first because he had lost weight.  He sat in the center section and when I shook hands with him after church, he said, "I need help.  I need prayer."
>
> I offered to pray for him right then, but he declined.  He said, "Just pray for me."
>
> I did feel the boy was reaching out.  I felt badly . . . that as a church we were not more sensitive (to his needs).

Later, the article said that a former tenant of Simmons's had told its reporter that Simmons "often attempted to persuade teenagers to attack and kill blacks in Moss Point."  Simmons's pastor stated that his church had black members, and he had never detected any animosity directed at them by Simmons.  Simmons argues that these statements demonstrate that his trial counsel should have investigated insanity or diminished capacity as a defense or for mitigation purposes.

The jury heard evidence that Simmons was a churchgoer.  The Court is not persuaded that a single instance of his asking his pastor to pray for him would have changed the outcome of the penalty phase, particularly if it could be interpreted as worry over his drug debt.  Evidence of a mental disorder that manifested itself in a desire to kill black people could easily have backfired on the defense, since one of the jurors was black.  In any event, Simmons's pastor refuted that claim.

Thus, the only evidence that his attorneys could have found with further investigation was that he was troubled in the days before the murder, he may or may not have been a racist, and, as previously considered by the Mississippi Supreme Court, his mother played bingo. This evidence is not persuasive on the issue of prejudice. Nor is the Court persuaded that Simmons should be given funds to hire mitigation experts, in the hope that these experts could "look into specific aspects of Simmons's background. These aspects *may* have included low intelligence, low self-esteem, dyslexia, depression, hostility, poverty of speech, isolation and estrangement . . . ." Pet'r Br., p. 67 (emphasis added).

In the Supreme Court cases cited above, the Court found prejudice because the evidence that should have been uncovered and related to the jury might have changed the weighing process. Here, this Court is left to weigh a short conversation with Simmons's pastor, potential racism, and his mother's bingo against the circumstances of this crime. Given the nature of the crime and the gruesome evidence before the jury, it is highly unlikely that this evidence would have changed the outcome of the sentencing proceeding.

Even assuming that Simmons's defense counsel should have taken some additional steps in presenting a mitigation case, their handling of the mitigation witnesses does not indicate the total lack of preparation that Simmons argues to this Court. His habeas attorneys have not persuaded the Court to fund an effort to determine whether further evidence exists. Based on the clearly established Supreme Court precedent in this area, the opinion of the Mississippi Supreme Court is not unreasonable, and habeas relief is not appropriate on this issue.

4. **The Trial Court Made Multiple Errors during the Sentencing Phase of the Trial by Precluding the Admission of Relevant Mitigating Evidence in Violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Although the heading of this argument refers to "multiple errors," the only actual error complained of is the trial court's exclusion of the videotape that Simmons recorded immediately after the murder. Simmons made the tape for his ex-wife and children. It is essentially a thirty-four minute monologue. Simmons sent the tape to his wife, who turned it over to his attorneys. Included in Simmons's statements on the recording are the following:

> I didn't think until it was done. I can't make it undone. I would have. Oh, God, I would have. I don't know how it happened and afterward, I would have given anything to take it back, even my life. It got out of hand and it wasn't supposed to go like this.

Pet'r Br., p. 74.

The tape was an issue before trial, in that the defense resisted providing a copy of it to the prosecution. This refusal culminated in an interlocutory appeal to the Mississippi Supreme Court, which denied relief, and the trial court ordered that the tape be released to the district attorney. Ultimately, the State elected not to use the tape during the guilt phase of the trial, but defense counsel offered it as an exhibit after the State rested and Simmons informed the court that he did not intend to testify. After a lengthy argument on the evidentiary issues implicated by the tape, the court refused to admit it into evidence. During the sentencing phase, the defense once more offered the tape as an exhibit, during the testimony of Lori Simmons. The trial court sustained the State's objection to its introduction. At the conclusion of her testimony, counsel offered it again, as an exhibit to be viewed by the jury, but the court refused to permit it.

Whether the videotape should have been admitted in the mitigation case was presented to the Mississippi Supreme Court in Simmons's direct appeal, where he argued that it demonstrated remorse for the crime. Although Simmons submitted United States Supreme Court precedent on the evidentiary latitude given to mitigation proof, the Mississippi Supreme Court did not address it. Instead, it held that the tape was inadmissible hearsay, particularly since he was available to testify. *Simmons v. State*, 805 So. 2d 452, 488-89 (Miss. 2002). Three justices dissented from the majority opinion, on grounds that the relaxed evidentiary rules appropriate to the sentencing phase of a capital murder trial should have permitted the introduction of the tape. *Id*. at 508-10 (Diaz, J., dissenting). Simmons raised the issue again in his post-conviction petition, and the court ruled that it was barred by the doctrine of res judicata. *Simmons v. State*, 869 So. 2d 995, 1000 (Miss. 2004).

Simmons is correct that the rules of evidence are somewhat relaxed for the introduction of mitigating evidence. Several United States Supreme Court opinions have taught that trial courts must permit the introduction of "all relevant mitigating evidence." *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982). The question presented here is whether Simmons's tape must also pass the State's evidentiary rules on admissibility to qualify as mitigating evidence. Simmons argues that such a holding is a "mechanistic" application of the hearsay rule to defeat the ends of justice, a practice condemned in *Chambers v. Mississippi*, 410 U.S. 284 (1973). A close examination of the cases cited by Simmons indicates that the trial court properly excluded the tape.

The case upon which Simmons chiefly relies is *Green v. Georgia*, 442 U.S. 95 (1979). There, the trial court excluded the testimony of a witness who had testified for the State in the co-defendant's trial. That witness had testified that the co-defendant admitted that he killed the victim after sending the defendant on an errand; however, the trial judge in Green's case excluded the

49

testimony as inadmissible hearsay. *Id.* at 96. The Supreme Court reversed, but its opinion states that the holding was based on the "unique circumstances" of that case. *Id.* at 97. Those circumstances included several factors that militated in favor of the statement's reliability, the fact that the testimony was highly relevant to a critical issue – the defendant's involvement in the crime – and the State's previous reliance on the testimony in the co-defendant's trial. In *Skipper v. South Carolina*, 476 U.S. 1, 6 (1986), the trial court excluded testimony regarding the defendant's good behavior in prison on grounds that it was incompetent lay opinion on the issue of future dangerousness. Again, the Supreme Court reversed, holding that this characterization of the testimony was improper. In so doing, however, the Court suggested that, by permitting a wide scope of evidence to be admitted in mitigation, it did not intend to obviate State evidentiary rules. Holding that the state court's ruling was based on a misapprehension of the purpose for which the evidence was offered, the Court later noted that the state could not impose another exclusionary rule, if it had the effect of "precluding the defendant from introducing *otherwise admissible* evidence . . . ." *Id.* at 7 (emphasis added).

The Fifth Circuit has interpreted the foregoing as leaving intact the relevant state's evidentiary rules. *Edwards v. Scroggy*, 849 F.2d 204, 212 (5th Cir. 1988). While the court there recognized *Chambers's* warning that the hearsay rule should not be permitted to pervert the ends of justice, it held that *Chambers* did not apply where the rule's application was not unnecessarily limiting or did not render the trial fundamentally unfair. Similarly, in *McGinnis v. Johnson*, 181 F.3d 686, 693 (5th Cir. 1999), the court upheld the exclusion, during the punishment phase, of hearsay statements made by the defendant to an expert psychologist. Holding that *Green* did not apply, the court determined that exclusion was proper because the psychologist's opinion testimony

50

regarding the defendant's statements was permitted.  More recently, the Fifth Circuit has specifically stated that the prohibition against hearsay "is not abrogated in the context of capital sentencing . . . ."  *Watts v. Quarterman*, 244 F. App'x 572, 576 (5th Cir. 2007).

The tape is, essentially, Simmons's own testimony about the crime, uninterrupted by cross-examination.  Even Simmons does not seriously argue that the tape is not inadmissible hearsay.  A review of the record shows that exclusion of the tape did not defeat the ends of justice or make the trial fundamentally unfair.  Simmons's friend, Dennis Guess, testified during the guilt phase that Simmons expressed remorse for the crime, saying that he had hurt enough people and did not want to hurt anyone else.  While Simmons claims that the prosecutors told the jury that he had no remorse, that may be an overstatement of their arguments.  Prosecutor Saucier said during closing argument in the guilt phase, "[a]nd at that point and time the only remorse that he displayed, the only remorse that Mr. Guess testified to, was the fact that he, Mr. Simmons, had made a terrible mistake and the girl had gotten away."  Prosecutor Harkey argued that Simmons was "divorced" from his conscience – Lori – during his closing in the sentencing phase, "[b]ut we are talking about the circumstances of this crime, him, this person who now has no conscience."

The exclusion of the videotape in this case was a valid application of Mississippi's evidentiary prohibition against hearsay.  The statements made on the videotape were more extensive, and might have been more persuasive, than the comments Simmons made to Dennis Guess.  However, introducing the tape would have sanctioned Simmons's pre-recording his mitigation testimony, free from the inconvenience of cross-examination.  Simmons was able to introduce evidence of his remorse through Guess's testimony.  Exclusion of the videotape did not have the effect of making the trial fundamentally unfair, and habeas relief is not available on this issue.

5.      **Petitioner Was Denied Effective Assistance at Trial Due to a Conflict of Interest in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

This assignment of error is based on the fact that Harvey Barton, one of Simmons's trial attorneys, had previously represented Dennis Guess and his father.  The State listed Dennis Guess as a prosecution witness; however, Barton did not interview him prior to his testimony.  Simmons now argues that Barton's conflicting loyalties caused him to inadequately prepare to question Guess, thereby permitting the jury to hear inadmissible evidence of a prior incarceration.  He further asserts that his claim should not be considered under the *Strickland* test of substandard performance and prejudice, but under the standard for conflict of interest cases employed in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which does not require a finding of prejudice.

The factual basis for Simmons's claim arose during the cross-examination of Guess, the friend who convinced Simmons to turn himself in.  Barton asked, "Now, I ask you whether or not Gary showed any remorse to you in the fact that he had cut Jeffery Wolfe up?"  Guess responded, "Extreme remorse.  He made a comment.  He said that while he was in prison they told him that it gets easier and easier.  He said this was so bad he just knew that he would never be able to do it again."  Defense counsel asked for a conference outside the presence of the jury and moved for a mistrial.  In his argument, counsel noted that the same question had been asked of Guess by investigators before trial, and his statement to them did not include any information about prison.  Barton then informed the court:

> I purposely did not talk to Dennis Guess before he took the witness stand for the reason that, number one, I represent his father and have for a number of years; number two, I think I have formerly given counsel advice to Dennis Guess; and,

52

number three, I was satisfied with what he was going to say in his statement and I
was prepared to accept that on the witness stand.

Tr. 489.

The trial court denied the motion for a mistrial, stating:

I'm confident that they [the jurors] realize that when he turned himself in that he
went to jail, he went to prison.  So there is no real definition in regard to the answer
of this question as to the time.  It does not say that he was in prison on a prior
occasion for a prior felony.

Tr. 490.

Although the trial judge offered to give a limiting instruction on the suggestion of the State,

defense counsel refused, in order to preserve his motion for a mistrial.  On direct appeal, Simmons

contended that *Cuyler v. Sullivan,* 446 U.S. 335, 349-50 (1980), governed this issue.  His trial

counsel, Harvey Barton, wrote the brief and stated therein:

It cannot be tenably denied that Mr. Barton, lead counsel in this death penalty
case, had a conflict of interest, and his loyalties were divided between Mr. Simmons,
Mr. Guess, and Mr. Guess's father.  Reversible conflict arises not only when an
attorney's loyalties are split between two codefendants but also when he or she
encounters a witness testifying against the defendant who was or is a client of the
attorney. . . .

In addition, it cannot be tenably denied (and indeed undersigned counsel
admitted as much in the court below) that Mr. Barton's conflict of interest adversely
affected his performance in representing Mr. Simmons.  Had Mr. Barton not had the
conflict of interest, he would have interviewed Mr. Guess prior to trial and ensured
that Mr. Guess did not blurt out in the front of the jury that Mr. Simmons had
previously been imprisoned. . . .

[O]nce Mr. Barton made the statement about Mr. Guess and his father, the
trial court knew or should have known that Mr. Barton had a conflict of interest.

Appellant's Br., pp. 17-20.

The Mississippi Supreme Court's opinion on direct appeal recognized the presumption of prejudice that occurs where counsel is operating under a genuine conflict of interest. *Simmons v. State*, 805 So. 2d 452, 480 (Miss. 2002). The court's decision is unclear on the issue of whether it found that a conflict actually existed. It referred to language in *Cuyler* applying that case to instances where counsel "actively represented conflicting interests." The court noted that the "possibility of conflict is insufficient to impugn a criminal conviction on appeal." The court then went on to consider the attorney's performance, using language from *Strickland* to establish the standard of measuring performance, noting that its review is "highly deferential." *Id*. at 479. *Cuyler*'s standard is less exacting, requiring only that the attorney's performance was affected by a conflict. *Roach v. Quarterman*, 220 F. App'x 270, 279 n.11 (5th Cir. 2007). Thus, a petitioner could meet *Cuyler*'s standard without showing sufficient prejudice under *Strickland*. *Id*. The Mississippi Supreme Court concluded that, "[t]here is no evidence in the record to suggest that defense counsel acted in some manner other than capable." *Id*. In its post-conviction opinion, the court held that the issue was governed by res judicata. *Simmons v. State*, 869 So. 2d 995, 1005 (Miss. 2004).

The question of whether there was an actual conflict of interest in this case is a mixed question of law and fact that is subject to independent review by this Court. 28 U.S.C. §2254(d)(1); *Strickland*, 466 U.S. at 698. Assuming that the conflict issue was not conclusively resolved by the state court, this Court is of the opinion that Simmons has not satisfied the first requirement of *Cuyler* – that there was an actual conflict. As to what circumstances can give rise to a legitimate claim of conflict, the Fifth Circuit has held that *Cuyler*'s analysis only applies in cases of multiple representations, and not in any other context – i.e., a conflict between the client and the lawyer's personal interests. *Beets v. Scott*, 65 F.3d 1258, 1266 (5th Cir. 1995). In a later case, the Supreme

Court suggested, but did not explicitly hold, that *Cuyler's* standard informs the ineffectiveness analysis only in situations involving multiple *concurrent* representations, not where one of the clients is a former client.  *Mickens v. Taylor*, 535 U.S. 162, 174 (2002).

The Fifth Circuit has taken the position that *Cuyler* can also apply in cases of successive representation, but only where certain conditions are met.  *United States v. Infante*, 404 F.3d 376, 392 (5th Cir. 2005); *Perillo v. Johnson*, 205 F.3d 775, 797 (5th Cir. 2000).  Those factors include "whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated."  *Infante,* 404 F.3d at 392.  In both *Infante* and *Perillo*, the court found a conflict where defense counsel's attorney had represented others involved in the same criminal transaction.  Here, that is not the case.  Barton told the trial court that Dennis Guess's father was a client and that "I think I have formerly given counsel to Dennis Guess."  It is not clear from that statement whether Dennis Guess was actually Barton's *client* at any time.  Even if he had been a client at some time in the past, Barton was not actively representing him at the time of Simmons's trial, and there is no indication that the legal advice Barton gave Dennis Guess was related in time or subject matter to Simmons's crime.  For these reasons, *Cuyler* does not apply.

In addition, Simmons has not explained, nor is it clear from the record, how his attorney's relationship with Guess was the cause of his failure to conduct a pre-trial interview.  In his Brief to this Court, Simmons's current counsel writes:

> Mr. Barton had previously represented Mr. Guess' father, and had also provided legal advice to Mr. Guess on prior occasions.  T. 489: 6-9.  Mr. Barton was concerned about the possible conflict of interest this situation created.  Mr. Barton felt divided

loyalties because, on the one hand, he did not want to betray his former client by betraying client confidences he learned by his former representation of Mr. Guess, but on the other hand he realized his duty to represent Mr. Simmons.  Mr. Barton decided that the best way for him to handle this delicate situation was not to interview Dennis Guess prior to trial or help Mr. Guess prepare for his testimony and to avoid any discussion with Mr. Guess about his anticipated trial testimony.

Pet'r Br., pp. 81-82.

This is a more detailed explanation of the perceived problem than was given to the Mississippi Supreme Court, but it still does not identify the actual conflict.  "[T]here is actual conflict when the attorney knows that his clients' interests diverge and must then choose between the interests of multiple clients, or be compelled to compromise his duty of loyalty."  *United States v. Culverhouse*, 507 F.3d 888, 893 (5th Cir. 2007).  Simmons has not adequately explained how interviewing Guess before trial would have resulted in the betrayal of client confidences from Guess, Guess's father, or Simmons.  Even his Brief to this Court states that the election not to interview Guess was based only on "some sense of divided loyalty to Mr. Guess."  Pet'r Br., p. 93.  Guess was not implicated in the crime in any manner.  There was nothing that Barton had to do beyond question Guess about his statement, which was no more than he would have done with any other witness.  Therefore, Guess had no particular interest in being interviewed or not being interviewed, and Barton would not have betrayed any client confidences by doing so.  Nor has Simmons explained why Barton did not ask his co-counsel to conduct the pre-trial interview and cross-examination.

There was no actual conflict in this case; at most, Barton perceived that there was one.  If that is true, and Barton acted on that perception, then the perceived conflict could have had the same effect on his trial performance as a real conflict.  It is, nonetheless,  questionable whether Simmons should benefit from the more relaxed *Cuyler* standard to determine whether his attorney's perception

had an adverse effect on his trial.  The Second Circuit has held that *Cuyler* should be limited to situations involving an *actual* conflict, rather than a conflict that the lawyer merely perceives. *Tueros v. Greiner*, 343 F.3d 587, 597 (2nd Cir. 2003).  Such a limitation promotes the policies served by the Sixth Amendment's right to counsel and the manner in which that right is enforced in different contexts:

> Although defense counsel's actual and perceived duties owed to parties other than the defendant may cause equal injury to the defendant's case, the question presented is whether defendant's burden should be the same when trying to prove that such injury amounts to a constitutional violation.  Only conflicts arising from actual duties are structural flaws in our adversarial system of justice that guarantees each defendant a lawyer functioning in an institutional role that permits zealous advocacy. A purely subjective conflict is, in contrast, an attorney's individual shortcoming, flowing from an incorrect assessment of the situation and devoid of any actual obligation.  Purely subjective conflicts are, in fact, no more than a polite way of saying personal mistakes, a traditional type of ineffectiveness of counsel to which *Strickland* rather than [*Cuyler*] is routinely applied.

*Id*.

The court added that an actual conflict was one more likely to be recognized and analyzed by the trial court at an early stage, while "a purely subjective conflict will almost always slip under the radar of the trial court."  *Id*. at 597, n.8. Given the facts of this case, a review under *Strickland* rather than *Cuyler* is appropriate.

Under *Strickland*, Simmons must demonstrate that Barton's failure to interview Guess prior to trial fell below an objective standard of reasonableness, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Assuming that failure to interview a key prosecution witness, who was likely amenable to being interviewed, would meet the first *Strickland* requirement, Simmons has not established the second requirement.  As the trial court noted in denying the motion for a mistrial, the

57

words "in prison" used by Guess could easily have been construed by the jury as referring to Simmons's pre-trial incarceration for Wolfe's murder.  No other evidence was presented to the jury to indicate that Simmons had been in prison for any other offense; in fact, the jury was told that Simmons was a hardworking, loving father and husband before this crime.  In light of the other evidence of Wolfe's murder, there is no reasonable probability that this single phrase changed the outcome of Simmons's trial.

A state court's decision cannot be the basis for habeas relief under the AEDPA unless its reasoning or result contradicted federal law that has been clearly established by the United States Supreme Court.  *Early v. Packer*, 537 U.S. 3, 8 (2003).  The result may be upheld even if the controlling cases are not cited, or even if the state court is unaware of those cases.  *Id*.  Based on the foregoing analysis, the *Strickland* standard was appropriately employed to address this issue, the Mississippi Supreme Court applied that standard, and its determination that Barton was not ineffective was not an unreasonable application of federal law.

**6.     The Trial Court Erred by Granting Numerous of the Prosecution's Jury Instructions during the Sentencing Phase in Violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.**

Simmons's assertions here are that: (1) the record is inadequate for this Court to make any reasoned judgment as to the content of the sentencing instructions, as they were not included in the record: (2) the mitigating instruction required, or could have been construed to require, unanimity in finding each mitigating circumstance; (3) the instruction on the "knowingly created great risk of death to many people" was not accompanied by an instruction defining "knowingly"; and (4) the jury was not told that they could consider the mitigating circumstance that Simmons was an accomplice whose participation in Wolfe's murder was relatively minor.  The Respondents' primary argument

is that these claims are barred, on grounds that the sentencing instructions were given without objection.  The record supports Respondents' position.

The omission of the jury instructions from the appeal record apparently became obvious during the pendency of Simmons's direct appeal.  The trial court (the judge who had originally tried the case had died by then, and another judge presided) held a hearing on that matter on March 19, 1999, at which one of the prosecutors, the Jackson County Circuit Clerk, and the court reporter who transcribed the trial record testified.  The omission of those instructions appeared to be the result of a clerical error, complicated in part by the use of parts of the Simmons file in the later trial of Timothy Milano.  During the March 19, 1999, hearing, counsel managed to reconstruct the instructions given in the guilt phase, and those were appended to the record as an exhibit to the hearing transcript.  The sentencing phase instructions given to the jury could not be located; therefore, counsel for Simmons offered into evidence a transcript of the original trial judge's reading of those instructions to the jury.  The instructions withdrawn by the defense were apparently located by Simmons's attorneys and were included in the record.

On appeal, Simmons asserted that the inadequacy of the record prevented his having a meaningful right of appeal.  The Mississippi Supreme Court recognized this deficiency as presenting "a difficult situation."  However, it held that the information added to the appeal record made it "sufficient to analyze all of the issues and properly review the case."  In light of Simmons's failure to show any information that should have been in the record, but was not later included, the court concluded that the issue was procedurally barred, and without merit.  The record supports this decision.

With regard to the content of the sentencing instructions, the record establishes that they were submitted by agreement at trial.  After the parties rested in the sentencing phase, the trial court conducted a short conference on jury instructions.  Defense counsel offered four instructions, numbered 18-21.  Instructions 18 and 20 were withdrawn.  Instruction 19 was incorporated into the State's instructions, and Instruction 21 was offered without objection from the prosecution.  After the brief conference, the judge and parties adjourned so that the prosecution could prepare the revised instructions.  When they re-convened, counsel agreed that the State's instructions and the defense's instructions had been properly combined.  There was no further argument on the sentencing instructions.

On direct appeal, this assignment of error was numbered XVIII.  After listing all of the numbered assignments of error, the Mississippi Supreme Court noted that XVIII was one of the errors that the State contended was procedurally barred as not having been presented to the trial court.  Although aware that it had relaxed its procedural bar in capital cases, the court recognized that the bar had nevertheless been applied in such cases, on a case by case basis.  The court concluded, "[w]hile these allegations of error are procedurally barred, we will address the merits of the underlying claims in the order raised by Simmons knowing that any subsequent review will stand on the procedural bar alone."  *Simmons v. State*, 805 So. 2d 452, 468 (Miss. 2002).  Simmons now argues that reaching the merits waived the bar.

A procedural bar will not prevent habeas review of an issue unless the last state court that ruled on the claim "clearly expressed its reliance on an adequate and independent state law ground . . . ."  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  Thus, a general statement that some of a petitioner's allegations could have been raised on direct appeal will not suffice.  *Id*. at 266.  Where

60

a state court has clearly expressed its reliance on a procedural bar, however, the fact that it alternatively rules on the merits will not vitiate the bar's validity. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005); *Thacker v. Dretke*, 396 F.3d 607, 614 n.8 (5th Cir. 2005). Here, the Mississippi Supreme Court clearly stated at the outset of its opinion that this issue was procedurally barred as not having been presented to the trial court. At the beginning of its discussion on this issue, which occurred later in the opinion, the court noted again that the sentencing instructions were given without objection. Therefore, the court did clearly express its reliance on the procedural bar to deny relief, and its subsequent discussion of the merits of the claim did not waive that reliance.

The doctrine of procedural default in a habeas case also presumes that a state procedural ground is adequate and independent – the rule must, for instance, be regularly followed – and ordinarily, the burden is on the habeas petitioner to demonstrate otherwise. *Coleman v.Thompson*, 501 U. S. 722, 750 (1991); *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). Simmons has presented no argument to that effect, as he contends that the court did not deny review of this claim. The Mississippi Supreme Court routinely applies a procedural bar where a defendant does not make a contemporaneous objection to the jury instruction about which he complains on appeal. *Jordan v. State*, 786 So. 2d 987, 1002 (Miss. 2001); *Lockett v. State*, 656 So. 2d 68, 73 (Miss. 1995), *overruled on other grounds by Jones v. State*, 700 So. 2d 631 (Miss. 1997); *Gray v. State*, 472 So. 2d 409, 416 (Miss. 1985), *rev'd on other grounds*, *Gray v. Mississippi*, 481 U.S. 648 (1987); *Billiot v. State*, 454 So. 2d 445, 462 (Miss. 1984); *Gilliard v. State*, 428 So. 2d 576, 583 (Miss. 1983), *overruled on other grounds by Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991); *Bieller v. State*, 275 So. 2d 97, 99 (Miss. 1973). The Fifth Circuit has recognized that the bar is consistently applied. *Johnson v. Puckett*, 176 F.3d 809, 824 (5th Cir. 1999) (holding that petitioner could not bring *Batson*

claim where he did not object at trial, as Mississippi regularly applied the contemporaneous objection rule to *Batson* claims).

In light of Simmons's failure to object to the instructions at trial, the Mississippi Supreme Court's opinion that he was foreclosed from raising the issue as grounds for relief is not an unreasonable application of federal law. His agreement to the manner in which the record was later supplemented to include the missing instructions, as well as his failure to show that any relevant information was excluded from the supplemental record, was properly recognized by the state court as barring further complaint. For these reasons, the Mississippi Supreme Court's opinion finding this issue barred will not be disturbed by this Court.

Simmons's arguments would not succeed on the merits, in any event. The finding of the Mississippi Supreme Court that the appeal record was adequate is a factual finding entitled to great deference by this Court. *See* 28 U.S.C. §2254(d)(2). The failure to properly preserve and include the trial court's instructions for the record is regrettable. However, the only omission of any importance that Simmons has identified is a definition of the term "reasonable doubt." He admits that the term was defined in the guilt phase instructions, but argues that "the sentencing phase was a different proceeding." To warrant habeas relief, however, Simmons must demonstrate that any defect in instructing the jury "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). Where an instruction given in one part of a bifurcated death penalty case should have been given in the other, and both cases were decided by the same jury, there is no constitutional error. *Baldwin v. Blackburn*, 653 F.2d 942, 950 (5th Cir. 1981).

Simmons contends that the sentencing instructions precluded the jury from considering any mitigating circumstances unless they were unanimously found to exist, in contravention of *McKoy v. North Carolina*, 494 U.S. 433 (1990), and *Mills v. Maryland*, 486 U.S. 367 (1988). In *McKoy*, the offensive instruction specifically required the jury to answer whether it unanimously found from the evidence the existence of any mitigating circumstance. In *Mills*, the jury was required to collectively mark "yes" or "no" on a jury form to indicate whether it had reached a decision on the mitigating circumstances, thus suggesting that it was not permissible to reach individual determinations. Those circumstances are not present here. Neither the instructions nor the form of the verdict required the jurors to vote on the individual mitigating circumstances, but only to vote on whether the mitigating circumstances outweighed the aggravating factors.

As to Simmons's argument that the term "knowingly" was not properly defined, Simmons has not directed this Court to any precedent that demands such a definition. When a petitioner claims an entitlement to habeas relief on grounds of an omitted instruction, the Court's inquiry is limited to determining whether the omission "by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Galvan v. Cockrell*, 293 F.3d 760, 764-65 (5th Cir. 2002). Here, there is little doubt that Simmons disposed of Wolfe's remains in the bayou for the purpose of having them consumed by alligators or dispersed with the current. That disposal was intentional and "knowing," and it was the act that created the risk to others. The failure to specifically define the word "knowingly" could not have so influenced the jury's verdict that it violated Simmons's due process rights. Simmons's argument that the jury should have been permitted to consider, as a mitigating circumstance, that he was a minor participant in the crime is likewise unpersuasive. The Supreme Court has expressly ruled that a party has no

entitlement to a mitigating circumstance instruction that is not supported by the evidence. *Delo v. Lashley*, 507 U.S. 272, 277 (1993). As discussed in the section on proportionality, Simmons's participation in this crime was hardly "minor," and he was not entitled to such an instruction. Clearly, in light of the evidence, failure to so instruct the jury could not have risen to the level of a denial of due process. For both procedural and substantive reasons, Simmons is not entitled to habeas relief on this issue.

7.    **The Trial Court Erroneously Granted Two of the State's Jury Instructions That Were Contrary to Federal Law and Were Violative of Petitioner's Federal Constitutional Right to a Trial by Jury.**

This argument attacks Instructions 3B and 11 given during the guilt phase of the trial. Simmons argues that 3B permitted the jury to find that Simmons was involved in a robbery if he did "take, steal or carry away the personal property of Jeffrey Wolfe *or* Charlene Brook Leaser . . . ." He contends that the instruction could have permitted one juror to find that he robbed Wolfe, but not Leaser, while another could find that he robbed Leaser, but not Wolfe, thus circumventing the requirement of unanimity in the jury's decision to convict. Instruction 11 was the aiding and abetting instruction, including in its ambit "one who willfully, unlawfully, and feloniously aids, abets, assists, or otherwise encourages the commission of a crime . . . ." Simmons asserts that the phrase "otherwise encourages" was not defined.

On direct appeal, the Mississippi Supreme Court held that the arguments on these instructions were procedurally barred as raising issues not brought before the trial court. The bar was applied in the same manner as it was to the last issue discussed in Section II(B)(6) herein, that is with a general statement at the beginning of the opinion, which listed the barred issues, although the court went on to discuss the merits of each. The court noted that Simmons had objected at trial to

Instruction 11 on grounds that it was an "aiding and abetting" instruction, rather than an incorrect statement of the law. *Simmons v. State*, 805 So. 2d 452, 475 (Miss. 2002). Having objected at trial on that specific basis, the court held that Simmons was precluded from raising another objection on appeal.

In his state post-conviction petition, Simmons apparently tried to resurrect his argument on Instruction 11 in a slightly different guise, claiming that its language was confusing and permitted the jury to find Simmons guilty "through a minimal act not rising to the level of the actual commission of a crime." *Simmons v. State*, 869 So. 2d 995, 1012 (Miss. 2004). The Mississippi Supreme Court again denied relief, accepting the State's argument that the issue was barred by the doctrine of res judicata. To the extent that Simmons was raising a different argument, the court held that it was further barred on grounds that the specific argument had not been raised on direct appeal.

As for Instruction 3B, the State maintained on appeal that Simmons had offered a different objection to the trial court. The Mississippi Supreme Court did not address this argument specifically, but at the beginning of its opinion, it found this entire issue procedurally barred as "not presented to the trial court." *Simmons*, 805 So. 2d at 467. The court also observed that Simmons had failed to supply the court with a copy of the instruction or a recitation of its contents. *Id*. at 476. In addition, a review of the evidence revealed that it supported the charge of robbery of both Wolfe and Leaser. The court relied on *Gray v. State*, 728 So. 2d 36, 71 (Miss. 1998), which held that, where the evidence is sufficient to support both phrases of a disjunctive statement, the use of the disjunctive term was without consequence.

Here, the Respondents re-assert that this issue is procedurally barred. In his rebuttal Brief, Simmons recognizes, but does not controvert, that position. Instead, he re-urges his contentions on

the state court's holding on the merits.  He has not attempted to demonstrate cause for and prejudice by the default, nor has he attempted to establish that the Mississippi Supreme Court relied on a bar that it has not routinely or regularly applied.  For the reasons discussed in the previous section of this Opinion,  the state court's decision withstands habeas scrutiny.

The argument would also fail on the merits.  The Supreme Court has held that a unanimous verdict that a defendant is guilty of murder may be upheld even if the jurors disagreed on the predicate acts.  *Schad v. Arizona*, 501 U.S. 624, 643-45 (1991).  This is particularly so where the alternative acts are equivalent in terms of moral culpability.  *Id*. at 644.  In *Schad*, the jurors could have believed either that the defendant committed a murder with premeditation or in the course of committing a robbery.  The Court explained:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone.  In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line.  Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

*Id*. at 632 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990)).

Here, robbing Wolfe was an element of the murder equally culpable to that of robbing Leaser.  The fact that some jurors could have made one finding and other jurors another does not detract from their unanimous verdict that Simmons was guilty of murder during the commission of a robbery.

As for Simmons's other claim – that the term "otherwise encourages" is unconstitutionally vague – the Respondents correctly cite to *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  There, the Court noted that, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  The question was whether the instruction "so infected the

66

entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72

(1973). That determination should be made after viewing the questionable instruction in the context

of other instructions, or as compared with the argument made by the prosecutor. In this case, one

of the prosecutors told the jury, "if you believe that Gary Simmons participated materially in any of

the proceedings prior to Timmy Milano shooting Jeffrey Wolfe, then he is as guilty as Timmy

Milano and should be found guilty of capital murder." The requirement that a co-defendant be a

"participant" in a crime to be charged with aiding and abetting is part of the Fifth Circuit Pattern Jury

Instructions adopted by the Mississippi Supreme Court in *Milano v. State*, 790 So. 2d 179, 185

(Miss. 2001). Whatever problem might have been created by the language of Instruction 11, if any,

it was clarified by the prosecutor's correct statement of the law in his argument. No due process

violation occurred, and Simmons's argument cannot succeed.

## 8. The Trial Court Committed Numerous Reversible Errors during the "Death/Life" Qualification Component of the Voir Dire.

Simmons argues two separate points: (1) that the trial court improperly excused a juror at the

State's request because of her uneasiness with the death penalty; and (2) that the trial court

improperly failed to exclude jurors at Simmons's request who would impose the death penalty

regardless of the law. The first issue involves juror Paula Evans. During the initial questioning by

the trial judge on the jurors' views on the death penalty, Evans stated that she was "opposed" to it.

The judge returned to each juror who had expressed difficulty with imposing the death penalty, and

he asked Evans whether she could "nevertheless follow the testimony and the instructions of the

Court and return a verdict of guilty, although that verdict could result in a death penalty . . . . "

Evans responded, "Yes, sir, I will try." The judge followed up by asking her whether she could "set

aside your personal opinion regarding the death penalty and not allow it to substantially reduce your ability to perform your duties as a juror according to the Court's instructions and your oath."  Again, Evans responded, "I will try."

After a lunch break, the prosecution began its voir dire by asking the jurors again whether they could consider the evidence in the case and vote for the death penalty if the circumstances warranted it.  The prosecutor requested that any jurors who could not follow the law in that respect raise their hands.  Several of the jurors who had previously expressed concerns during the court's questioning did so, but Evans did not.  She did respond, however, when the prosecutor asked, "[w]as there anyone who raised your hand earlier and were not in the group who just stood; who talked to the Judge and decided, well, maybe I can?"  Evans raised her hand and replied, "[e]arlier I had said that I was opposed to the death penalty, I felt like I could set that aside and listen to the evidence and make a judgment on it."  The prosecutor asked her whether that was still her belief, and she answered "Yes."  The following exchange occurred:

> Q.   Did you hear my question to Mrs. Reede?  Is your opposition, is it religious, or social or just personal to you?
>
> A.   More personal.
>
> Q.   Okay.  Do you think that would influence you, those personal beliefs, in finding Mr. Simmons guilty or not guilty?  Could it influence you one way or the other?  I need to know.
>
> A.   I would try not to let it.  As far as separating your emotions, you know.
>
> Q.   Do you think you can?
>
> A.   I think I can.
>
> Q.   I will try.  That's as good as we can do sometimes.  Do you think you can?

A.      I think I can.

Q.      Do you promise me you will try?

A.      I promise I will try.

Over the objection of defense counsel, Evans was struck for cause after the State argued that it was not enough for Evans to state that she would "try" to follow the law.  On direct appeal, the Mississippi Supreme Court held that excusing Paula Evans was not error.  "This Court has held that a prospective juror who indicates that he or she would 'try' to follow the court's instruction is not enough. *Billiot v. State*, 454 So. 2d 445, 457 (Miss. 1984)."  *Simmons*, 805 So. 2d at 503.  Simmons argues that this decision unreasonably applied federal law, as announced in *Wainwright v. Witt*, 469 U.S. 412 (1985), and *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

*Witt* does not help Simmons.  There, the Court held, first,  that bias need not be established unequivocally to support striking a juror for cause.  *Id*. at 424-25.  Second, where the juror's responses are ambiguous, his demeanor may be the means by which the trial judge determines bias. *Id*. at 426.  Because the trial judge has made a finding of bias that he or she is in a unique position to assess, the striking of a juror for bias is entitled to deference on habeas review.  *Id*. at 427-30. These holdings were reinforced in a later decision, where the Court applied *Witherspoon* and *Witt* to the removal of a juror who stated on several occasions during voir dire that he could follow the law regarding the death penalty, but also made several equivocal statements on that issue.  *Uttecht v. Brown*, 127 S. Ct. 2218 (2007).

Reviewing its precedent on the removal of jurors who indicated an unwillingness to impose the death penalty, the Court recited four principles that had been established by earlier cases:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. [*Witherspoon*]  Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. [*Witt*]  Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. [*Witt*]  Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. [*Witt*]

*Id*. at 2224.

In *Uttecht*, the state appellate court did not make a specific reference to the *Witherspoon/Witt* rule; nonetheless, the Supreme Court held that the state court's decision was proper, since it identified the rule, recognized the deference to be accorded to the trial judge, and applied an abuse of discretion standard. *Id*. (citing *Early v. Packer*, 537 U.S. 3, 7 (2002)).  According to the Court, "[i]t is the trial court's ruling that counts." *Id*.

Here, when the prosecutor asked that Evans be excused for cause, he told the court that she had strongly indicated that she did not believe in the death penalty, and, although she said she would try to follow the court's instructions, that was not sufficient.  Defense counsel objected to her removal.  In response, the prosecutor repeated his position, citing state law, then said:

> [a]nd I think that dovetails, Your Honor, under the *Wainwright vs. Witt*, decision.  It's not necessary that a juror state in unmistakable terms that they could not follow the court's instruction.  It's only necessary that it become clear to everyone or at least to the Court that the person's responses to the questions indicate that her beliefs would substantially impair or impede, could influence.

Tr. 275-76.

The trial judge inquired whether there was any objection, prompting defense counsel to state, "Judge, again, I think it's a subjective thing for the court to decide on.  But I'm not going to consent

70

to that one being excused for cause." The judge then excused Evans for cause. The record demonstrates that the argument to the trial judge put the *Witt* test squarely before that court, both the test for bias and the judge's discretion to determine whether bias existed.

The Mississippi Supreme Court's ruling on Evans's removal states that it is not enough for a juror to state that she will "try" to follow the court's instructions, and cites *Billiot v. State*, 454 So. 2d 445, 457 (Miss. 1984). In *Billiot*, the court indicated that a juror who stated that she would "try" to follow the court's instructions should have been removed for cause, although there was no error because the defendant exercised a peremptory challenge to strike her. *Id.* The court's ruling relied on a principle stated in the earlier case of *Armstrong v. State*, 214 So. 2d 589, 593 (Miss. 1968). There, the court held "[t]hose who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released." *Id.* This is a proper summary of the law, as announced in *Witt*, that a juror whose ability to follow the law is substantially impaired should be removed for cause. Later in its opinion on Simmons's direct appeal, the court noted that the conduct of voir dire was a matter left to the sound discretion of the trial court, which is also a fair statement of the principles announced in *Witt* and *Uttecht*. *Simmons*, 805 So. 2d at 503.

Both the trial court and the Mississippi Supreme Court demonstrated an understanding of the principles summarized in *Uttecht*. Evans's responses during voir dire were, at best, equivocal on whether she could consider the death penalty in Simmons's case. The trial judge was in the best position to observe her demeanor and determine whether her equivocation demonstrated bias, and the prosecutor's argument in seeking her removal relied on the appropriate legal standard. In

removing Evans, and in affirming that removal, the state courts did not unreasonably apply federal law, and Simmons is not entitled to habeas relief on the issue of striking Evans from the jury.

Simmons's remaining argument on this issue relates to the trial court's failure to remove other jurors whom he claims were biased in favor of imposing the death penalty. Those jurors were Shirley Price, Andrew Hart, Jason Null, Retha Schanrock, John Haynes, Annie Robertson, and Ruby Jean Johnson. Each of these jurors was struck by the defense, which ultimately exercised eleven of its twelve peremptory strikes. The Mississippi Supreme Court recognized the impact of this fact in its opinion on Simmons's direct appeal, stating, "[o]ur settled rule requires that, before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges." *Simmons*, 805 So. 2d at 503.

> We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had the power to do.

*Id.*

The court also affirmed on the substance of the claim, holding that each of the challenged jurors testified that he could put aside his personal views and follow the law. The Mississippi Supreme Court's language echoes that of the United States Supreme Court on this subject. In *Ross v. Oklahoma*, 487 U. S. 81, 88-89 (1988), the Court determined that the trial court's error in failing to remove a juror for cause did not give rise to a constitutional claim, where the defendant was able to remove the juror with a peremptory challenge. The record reflected that the defense used the sixth of its nine challenges to remove the juror in question and, ultimately, exhausted all nine of the challenges provided by Oklahoma law. None of the jurors eventually seated was challenged for

cause by the defense, although there was a general claim made at the close of jury selection as to the racial composition of the jury.

The Supreme Court ruled that a defendant's Sixth Amendment right to an impartial jury is based on the jurors who are actually seated. *Id*. at 85-86. So long as the complained of juror was excused, by whatever mechanism, and there was no challenge for cause to any seated juror, no Sixth Amendment right is violated. The Court completely rejected the claim that the right to due process was abridged by compelling the defendant to use a peremptory strike to remove a biased juror. The Court reiterated its long-standing rule that "peremptory challenges are not of constitutional dimension." *Id*. at 86. Thus, "it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their execution." *Id*. at 89. The Court recognized the requirement of Oklahoma law that a defendant must use a peremptory challenge to remove a biased juror to preserve any error, quoting language quite similar to that used by the Mississippi Supreme Court in the *Simmons* opinion. "'He cannot speculate on the result of the jury's verdict by consenting that the juror sit on the panel, and, if the verdict is adverse, then assert he is disqualified.'" *Id*. at 90 (quoting *McDonald v. State*, 15 P.2d 1092, 1094 (1932)). Concluding that a defendant's right to peremptory challenges is only abridged if he does not receive the allotment of challenges provided by state law, the Court held that Ross received, and employed, all of the challenges due him, such that no error occurred.

Later, the Court decided *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), the appeal of a federal prosecution. As in *Ross*, the defense was required to use a peremptory challenge to remove a juror who should have been removed for cause. The defense ultimately used all of its challenges, and did not request more. The Ninth Circuit reviewed the conviction and held that no

Sixth Amendment right was violated, as the jury did not contain a member shown to be biased. However, it held that the defendant's Fifth Amendment due process rights were violated by effectively denying the defendant a challenge to which he was entitled under federal law.

The Supreme Court reversed, disagreeing with the defendant's argument that he was forced to use his challenge to remove the juror. The Court held that a defendant in such a situation has the option of permitting the questionable juror to serve and, upon conviction, pursuing a Sixth Amendment challenge on appeal. *Id*. at 315. However, because Martinez-Salazar chose to exercise a peremptory challenge to remove the juror, he "received precisely what federal law provided" and could not establish a due process violation. *Id.* at 317.

Simmons completed jury selection without exhausting his peremptory challenges. The Mississippi Supreme Court ruled that he could not complain that he utilized some of those challenges to remove jurors he thought were biased. That ruling is in complete accord with *Ross*, and there is no entitlement to habeas relief on this issue.

### 9. Petitioner's Motion for a Continuance Should Have Been Granted and the Failure to do so Was a Violation of Due Process and the Sixth Amendment As Set Forth in the United States Constitution.

Simmons maintains that the trial court should have granted his request for a continuance, made eight days before the trial was to begin, as well as his request for a continuance made at the close of Leaser's direct examination. The basis for the first request was so that he would have time to obtain a DNA expert and have him review the test results from the State Crime Lab. The basis for the second request was Leaser's recanting, during trial, her previous story that both Simmons and Timothy Milano raped her.

Simmons's trial began on August 23, 1997.  On July 23, the State released results of DNA testing performed on several samples taken from Simmons's residence during the investigation. None of those samples linked Timothy Milano with the crime.  On August 8, Simmons filed a motion for expert funds and a motion for a continuance, both of which were heard on August 15. At that hearing, the State argued that defense counsel had known for months that DNA testing was being conducted on those samples and could have sought funds at an earlier time for his own testing, or for his own expert to observe the Crime Lab's testing.  Although the State did not object to funding for an expert, it did object to the continuance.  At the hearing, the trial judge asked defense counsel if he had an expert in mind, but counsel could not tell the court whom he planned to hire or how much it would cost.  The trial judge's ruling was lengthy and thoughtful, as follows:

> BY THE COURT:  The Defendant must indicate the purpose and value of the expert regarding the innocence of this Defendant.  You must show need of an expert and that it would be a significant factor in the trial.  And, of course, then the State would provide funds for an expert once we took these matters into consideration.  Those things haven't been brought to me, and it's difficult for me to make a decision in regard to this particular request for an expert without the knowledge of who you want, how much will it cost.  The State says the purpose that you want them for is to analyze the DNA.  If you do that, it would be impossible for them to do it between now and the time the case is set for trial.  Of course, if you wanted to analyze the DNA, you could have gotten samples at the same time that the State sent their samples to the Mississippi Crime Lab, which would be a considerable time ago.  It hasn't been properly shown that there is a sufficient need, and you must show that if you don't have one it would be prejudice to your client.  Everything that I hear in regard to the DNA sounds to me like there are going to be eyewitnesses or an eyewitness anyway.  I guess the DNA just would affirm one witness's credibility over another witness's credibility.  But I'm going to allow you to have a DNA expert to assist the Defendant in cross-examination of the State's DNA expert.  The State has offered their expert to you.  And I assume that he could go to the State Crime Lab and go through their procedures to see and review the process in which they did the DNA.  And I have no objection to even having the expert DNA for the Defendant present in the courtroom at the time of the cross-examination of the State's DNA expert for consultation by counsel to assist in the cross-examination of that

Defendant.  But before I even do that, I have got to find out who and how much. Because I can't give you a blank checkbook on Jackson County.

Tr. 145-47.

The trial court refused the request for a continuance on grounds that Lauderdale County had already begun the process of summoning jurors.

At trial, Debbie Haller from the Mississippi Crime Laboratory testified as to DNA testing that she performed on the samples from Simmons's home.  When the State tendered her as an expert, defense counsel informed the court that he had hired Dr. Ron Acton[4] as an expert, and that Dr. Acton had tried unsuccessfully to reach Haller prior to her testimony.  To accommodate the defense and permit its expert to assist counsel in preparing to cross-examine Haller, the trial judge recessed court for the remainder of the  afternoon, requiring Haller to drive from Jackson to Pascagoula again the next day.  Haller ultimately testified that the blood found on several items at Simmons's residence was consistent with other DNA samples from Jeffrey Wolfe.  Fluid found on the condom recovered from Simmons's residence was consistent with DNA samples from Leaser and Simmons.  Defense counsel conducted a vigorous cross-examination of Haller, but Dr. Acton was not called to testify; apparently, he did not attend the trial.

In its opinion on Simmons's direct appeal, the Mississippi Supreme Court first recognized the considerable discretion granted to the trial judge in determining whether a continuance is necessary.  *Simmons*, 805 So. 2d at 484.  A decision to deny a motion for continuance is not ordinarily reversed unless a "manifest injustice" has occurred.  *See id*.  Simmons failed to make any showing as to what evidence would have been presented to the jury if his attorney had been given

---

[4]The expert was referred to in the trial transcript as "Dr. Acting," but apparently Dr. Acton is his real name.

additional time to prepare.  In the absence of such evidence, the court could not find that a manifest injustice had resulted from the denial of a continuance; therefore, relief was not warranted.  *Id*. at 485.  In his post-conviction petition, Simmons again raised the continuance issue, which was denied on grounds of res judicata.  *Simmons v. State*, 869 So. 2d 995, 1007 (Miss. 2004).  Simmons asserted the claim as a basis for contending that trial counsel was ineffective.  The court explained, "Simmons has produced nothing, even at this time, from Dr. Ron Acton, Simmons's DNA expert at trial, or anyone else, which calls into question the accuracy of the results testified to by the State's DNA expert."  *Id*. at 1005.  For this reason, there was no prejudice, and the claim was denied.

In his argument to this Court, Simmons does not seem to contest the DNA results, insofar as they identified Wolfe's blood and tissue on items found at his house.  Instead, he is concerned with the identification of only his DNA on the items tested – specifically, the condom found on the floor – and not the DNA of Timothy Milano.  According to Simmons, his trial strategy was to shift as much blame as possible to Timothy, which was made more difficult by the lack of DNA evidence placing Timothy at the scene or implicating him in Leaser's rape.

This strategy became even more difficult after Leaser changed her story of the rape to exclude Timothy as a participant.  Simmons's attorneys were not aware of the change until she testified at trial.  Prior to cross-examining Leaser, Simmons's attorneys moved for a mistrial or a continuance on that basis.  Counsel argued that he would have more forcefully cross-examined Haller on the DNA evidence had he known that Leaser planned to testify that only Simmons raped her, telling the trial judge, "I am putting Timothy Milano on trial in this case.  That's my defense."  When pressed by the trial judge about how that evidence would have been exculpatory, defense counsel maintained

77

that the inconsistency would have discredited all of Leaser's testimony. The judge advised counsel to cover the matter in cross-examination.

On direct appeal, the Mississippi Supreme Court agreed that Simmons had not shown that a continuance would have enabled him to acquire exculpatory information. "Here . . . . it is not clear that the evidence Simmons complained of favored his case or harmed the State's case against him. This issue is without merit." *Simmons*, 805 So. 2d at 485. The court found this argument barred by res judicata in the post-conviction opinion. *Simmons*, 869 So. 2d at 1007.

Simmons concedes that the United States Supreme Court has held that the matter of a continuance is "traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). The determination must be made on a case by case basis, analyzing "the reasons presented to the trial judge at the time the request is denied." *Id.* In the context of a habeas case, where it must be determined whether an alleged trial error violated the Constitution, the court must evaluate whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Thus, a habeas petitioner is not entitled to relief based on trial error unless it resulted in actual prejudice.

Simmons has not demonstrated prejudice; he has never explained to any court what additional evidence he could have obtained with more time that might have assisted him. Simmons insists that DNA evidence placing Timothy Milano at the scene was critical to his defense; however, Leaser testified that Timothy was the shooter; DNA evidence was not required to place him at the scene. The best that Simmons could have expected was that Timothy's DNA would have been found

78

on a condom, indicating that he participated in raping Leaser.  Given the fact that Wolfe's murder took place at Simmons's home, that Simmons's knives were used to dismember Wolfe's body, that body parts were found in the bayou next to Simmons's home, that Simmons took his butcher knives home the afternoon of the murder, that Sonny Milano placed Simmons at his home and testified that Simmons asked him to invite Wolfe to come over, that Simmons confessed his crime and the intended use of Leaser for sex to his friend Dennis Guess, and that Simmons's attorneys were permitted to cross-examine Leaser on her change of testimony, it is difficult to conceive how additional time would have assisted in his defense.  Simmons's conclusory allegation that his due process rights were violated by the trial court is not enough to create an entitlement to habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding.")  Based on the record, this Court cannot conclude that the Mississippi Supreme Court unreasonably applied federal law.  This claim must be denied.

**10.**   **The Trial Court Erred When It Failed to Instruct the Jury That the Prosecution Had to Prove That the Aggravating Factors Outweighed the Mitigating Factors beyond a Reasonable Doubt in Order for a Death Verdict to Result.**

This argument rests on the proposition that the instruction given to the jury regarding its consideration of aggravating and mitigating circumstances was flawed because it failed to require the jury to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, and because it improperly shifted to Simmons the burden of proving that the mitigating factors outweighed the aggravating circumstances.  Simmons also repeats his assertion that the "great risk of death to many persons" aggravator was improper and argues that the "pecuniary gain" aggravator was invalid as not sufficiently narrowing the class of defendants eligible

for the death penalty.  The instruction at issue tracked Miss. Code Ann. § 99-19-101 (3) (c) (1972),

and stated, in pertinent part:

> If one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances.  Consider the following elements of mitigation in determining whether the death penalty should be imposed: (1) the age of the Defendant at the time of the crime; (2) the family status of the Defendant; (3) the fact that Defendant turned himself in to authorities; (4) any other matter – any other aspect of Defendant's character or record and any other circumstances the Defense brought to you during the trial of this case which you, the jury, deem to be mitigating on behalf of the Defendant.  If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it or they outweigh or outweighs or overcome the aggravating circumstances you have previously found.  In the event that you find the mitigating circumstances or circumstance do not outweigh or overcome the aggravating circumstance or circumstances, you may impose the death penalty.  Should you find that the mitigating circumstances outweigh or overcome the aggravating circumstance or circumstances, you should not impose the death penalty.

The State argues that these claims are procedurally barred, as no objection was raised to this

instruction at trial.  The Mississippi Supreme Court agreed.  In its alternative discussion on the

merits, the court noted that the sentencing instructions were given by agreement and without

objection.  For the reasons discussed earlier, this Court finds that these claims are procedurally

barred.  Nor could they succeed on the merits.

Simmons's claim that the "great risk of death to many persons" aggravator is invalid has

already been addressed by this Court.  He also argues, for the first time, that the "pecuniary gain"

aggravator is invalid under *Tuilaepa v. California*, 512 U.S. 967, 972 (1994), as not adequately

narrowing the class of persons who may receive the death penalty.  *Tuilaepa* does state that an

aggravating circumstance does not perform a narrowing function if it can be applied to every

defendant eligible for the death penalty.  However, the fact that it would apply to a "sizable class"

of those persons does not render the aggravator constitutionally invalid.  *Arave v. Creech*, 507 U.S. 463, 475 (1993).  The "pecuniary gain" aggravator does not apply to every murder, only to those in which the defendant killed for some financial purpose.  Leaving aside the fact that this argument is barred, it does not justify habeas relief on its merits.

The Mississippi Supreme Court denied relief on the claims regarding the appropriate burden of proof.  First, the court held that, under state law, the burden of proving that the death penalty is the appropriate punishment is assigned to the prosecution.  "Neither the burden of production nor the burden of proof ever shifts to the defendant."  *Simmons*, 805 So. 2d at 500 (citing *Williams v. State*, 684 So. 2d 1179, 1202 (Miss. 1996)).  Second, the court concluded that state law did not require proof that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.  *Id.* (citing *Edwards v. State*, 737 So. 2d 275, 314 (Miss. 1999)).

Simmons's position that the Mississippi Supreme Court's decision is contrary to clearly established federal law relies on his generalizations from U. S. Supreme Court precedent that the State must prove every element of a crime, including aggravating circumstances in a death penalty case, beyond a reasonable doubt.  *See, e.g., Jackson v. Virginia*, 443 U.S. 307 (1979).   From *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), Simmons draws the requirement that the jury find all facts that must be proved before the death penalty can be imposed.  Reviewing the reasoning of these cases, as well as others, Simmons arrives at the conclusion that any sentencing scheme that does not require a finding – beyond a reasonable doubt – that aggravating circumstances outweigh mitigating ones is constitutionally defective.  Other

81

Supreme Court cases, including *Walton v. Arizona*, 497 U.S. 639 (1990),[5] which Simmons cites in

support of his argument, have reached the opposite conclusion.

In *Walton*, the Court reviewed a sentencing statute that permitted the imposition of the death

penalty where an aggravating circumstance had been found and it was determined "that there are no

mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. Ann. § 13-703

(1989). *Walton* specifically rejected the contention that the Arizona statute unconstitutionally shifted

the burden to the defendant to establish mitigating circumstances sufficient to avoid the death

penalty. "So long as a State's method of allocating the burdens of proof does not lessen the State's

burden to prove every element of the offense charged, or in this case to prove the existence of

aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the

burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*,

497 U.S. at 650.

Later, in *Tuilaepa*, the Court held that sentencing instructions were not constitutionally

flawed because they did not give the sentencing jury any specific guidance on weighing aggravating

circumstances against mitigating factors. *Tuilaepa*, 512 U.S. at 979. The Court found such guidance

unnecessary since, once the jury finds that the defendant fits within the category of death-eligible

offenders defined by the state's legislature, it is "free to consider a myriad of factors to determine

whether death is the appropriate punishment." *Id.; see also California v. Ramos*, 463 U.S. 992, 1008

(1983). In fact, the jury may be given "unbridled discretion in determining whether the death penalty

---

[5]*Walton* was ultimately overruled in part by *Ring*, but only as to its affirmance of Arizona's allowing the judge, rather than the jury, to make findings on aggravating circumstances. In all other respects, it remains good law and continues to be cited by the Court.

should be imposed after it has found that the defendant is a member of the class made eligible for

that penalty." *Tuilaepa*, 512 U.S. at 979 (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).

More recently, the Court considered a Kansas statute that contained the following language:

[i]f, by unanimous vote, the jury finds beyond a reasonable doubt that one or more
of the aggravating circumstances enumerated in K.S.A. 21-4625 . . . exist and,
further, that the existence of such aggravating circumstances is not outweighed by
any mitigating circumstances which are found to exist, the defendant shall be
sentenced to death, otherwise the defendant shall be sentenced as provided by law.

*Kansas v. Marsh*, 548 U.S. 163, 166 (2006); Kan. Stat. Ann. § 21-4624(e) (1995).

The Kansas Supreme Court had reversed the death penalty imposed in that case, holding that

the statute unconstitutionally permitted the sentence where the aggravating and mitigating

circumstances were in equipoise.  Holding that the Kansas statute functioned in substantially the

same manner as the Arizona statute discussed earlier, the Supreme Court held that *Walton* controlled

and reversed the state court.

According to the Supreme Court, its "mitigation jurisprudence" extends only to the point that

defendants are entitled to present, and sentencers are required to consider, information relevant to

the sentencing decision.  "So long as the sentencer is not precluded from considering relevant

mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less

automatically, impose death." *Marsh*, 548 U.S. at 171.  Even though the defendant had the burden

of producing mitigation evidence, and even though the statute permitted imposition of the death

penalty when the aggravating and mitigating circumstances were in equilibrium, the statute was

constitutional.  Based on the rationale of these cases, there is no clearly established federal law that

was unreasonably applied by the Mississippi Supreme Court's consideration of this claim on the

merits.  Clearly, the United States Supreme Court does not intend to re-write death penalty statutes

to substitute its own weighing process for that determined by state legislatures.  Simmons could not

succeed on the substance of his argument, even if it was not procedurally barred.

11.     **The Trial Court Violated the Fifth, Sixth and Fourteenth Amendments by Limiting the Jury Venire to Qualified Electors of Lauderdale County or Resident Freeholders for More Than One Year, by Limiting the Jury Venire to Persons over the Age of Twenty, and by Limiting the Jury Venire to Persons Who Can Read and Write.**

Simmons challenges the selection of his jury pursuant to Miss. Code Ann. § 13-5-1 (1972),

which limits jury service to qualified electors or resident freeholders of the county for more than one

year, who are at least twenty-one, can read and write, have never been convicted of an infamous

crime or the unlawful sale of liquor, and are not common gamblers or habitual drunkards.  The

Mississippi Supreme Court held that Simmons was precluded from arguing this issue because he

failed to object to the use of this criteria at trial.  *Simmons*, 805 So. 2d at 505.  Respondents re-urge

that procedural bar here.  As he has in several other arguments in this case, Simmons maintains that

the claim is not barred because the state court discussed its merits.  As the Court has discussed earlier

herein, a state court may make an alternative merits ruling on an issue without waiving its holding

that the issue is barred.  *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005).  Therefore, this Court

will not disturb the Mississippi Supreme Court's decision finding the issue barred.

The Mississippi Supreme Court also denied relief because the record did not support this

contention.  Simmons has not identified the means by which jurors were summoned in Lauderdale

County; presumably, the venire could have included people who did not meet the requirements of

the statute.  The record demonstrates that the trial judge began voir dire by questioning the jurors

about these qualifications; however, no juror was excused on the basis that he did not meet them.

As the state court recognized, Simmons cannot show that he was prejudiced by the juror

requirements of the statute. *Simmons*, 805 So. 2d at 505. Relying on other death penalty decisions, the court further found the statute's restrictions on jury service permissible under state law. *Id*. Even if Simmons's claim is considered on the merits, he cannot establish that the Mississippi Supreme Court's opinion is contrary to clearly established federal law.

The requirement that a jury be pulled from a fair cross-section of the community is fundamental to the Sixth Amendment's guarantee of a fair trial. *Taylor v. Louisiana*, 419 U.S. 522, 697-98 (1975). Selecting a jury from only special segments of the community, or excluding large, distinctive groups, violates that guarantee. *Id*. at 698. In *Taylor*, the Supreme Court declared that the State of Louisiana had violated the Sixth and Fourteenth Amendments by excluding women from jury service. Simmons extrapolates from the language of that case the contention that the exclusion of certain potential jurors in his case because they did not meet the requirements of § 13-5-1 violated his Sixth and Fourteenth Amendment rights, as well as the jurors' Fifth Amendment right to equal protection. *Taylor*, however, does not command such a result.

> Our holding does not augur or authorize the fashioning of detailed jury selection codes by federal courts. The fair-cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community. . . .

*Id*. at 537-38.

The Supreme Court later clarified *Taylor* to require that the complaining party demonstrate "that the group alleged to be excluded is a 'distinctive' group in the community." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Women satisfied that test, as being "sufficiently numerous and distinct from men . . . ." *Id*. The Fifth Circuit has refused to extend *Taylor*, holding that the underrepresentation of Hispanics on Dallas County juries due to the low pay for jury service did not

85

deny the defendant a venire consisting of a fair cross-section of the community. *Hearn v. Cockrell*, 73 F. App'x 79 (5th Cir. 2003). "Defendants are not entitled to a jury, jury wheel, pool of names, panel, or venire of any particular composition, and there is no requirement that those bodies 'mirror the community and reflect the various distinctive groups in the population.'" *Id.* (quoting *Taylor*, 419 U.S. at 538).

Simmons has not directed this Court to a United States Supreme Court decision that mandates relief on this issue, as there is no clearly established federal law that invalidates Mississippi's requirements for jury service. Nor can Simmons show that he was prejudiced by those requirements. Finally, his failure to object to them at trial bars any subsequent complaint related to their application. For all of these reasons, Simmons is not entitled to habeas relief on this claim.

**12.    The Trial Court Committed Reversible Error by Sustaining the Prosecutor's Objection to Petitioner's Manslaughter Instruction.**

Simmons maintains that the evidence supports his claim that Wolfe was killed during a confrontation over the drug money that was owed him. He refers to Leaser's testimony that Wolfe told her he always carried a .9 mm pistol, as well as her proffered testimony that Wolfe told Sonny Milano about a confrontation with his roommate. Simmons also offers the testimony of Dennis Guess, who stated that Simmons told him that there was an argument over the money immediately before the shooting. The Mississippi Supreme Court disagreed that this evidence warranted a manslaughter instruction.

Under Mississippi law, Simmons has the burden of overcoming the presumption that Wolfe's death was the result of a murder. *Simmons*, 805 So. 2d at 474 (citing *Nicolaou v. State*, 534 So. 2d 168, 171 (Miss. 1988)). The court found that the testimony offered by Simmons was not sufficient

to overcome this presumption.  Moreover, under Mississippi law, a defendant is not entitled to a manslaughter instruction where a killing occurs in the course of a robbery.  *Id.* (citing *Burns v. State*, 729 So. 2d 203, 225 (Miss. 1998)).  Simmons asserts that the Mississippi Supreme Court's holding is contrary to United States Supreme Court precedent, citing *Schad v. Arizona*, 501 U.S. 624 (1991), and *Beck  v. Alabama*, 447 U.S. 625 (1980).

Respondents contend that Simmons is barred from advancing this argument, as he did not refer to federal law in his state court pleadings.  A review of the direct appeal and post-conviction pleadings confirms this position.  Simmons does not refute this argument, but counters that the issue is not barred because the Mississippi Supreme Court reached the merits of this claim.  However, the Mississippi Supreme Court reached the merits of Simmons's state law claim because that is the claim that was argued to it.  It never reached the merits of his federal law claim since it was not advanced before that court.  A United States Supreme Court case cited in the earlier proportionality discussion controls here.  In *Anderson v. Harless*, 459 U.S. 4, 6 (1982), the Court dismissed a habeas claim where, although the petitioner had raised all of the facts supporting his federal claim to the state court, he had failed to couch his claim in terms of federal law.  The Court stated that it was doubtful that citation to state law would sufficiently apprise the state court of a federal claim, even if the cases cited discussed a federal claim.  *Id*. at n.3.

Later, the Court decided *Howell v. Mississippi*, 543 U.S. 440 (2005).  There, the defendant also complained that the trial court, in a capital murder case, erred by failing to instruct the jury as to the elements of manslaughter.  The Supreme Court held that it need not address the merits of the constitutional claim because Howell had not mentioned a federal claim in his state court pleadings. *Id*. at 444.  *Howell* and *Anderson* make it clear that Simmons's claim is barred.

Simmons's claim would nevertheless fail on the merits.  *Beck v. Alabama*, 447 U.S. 625, 636 (1980), holds that a defendant in a capital murder case is entitled to an instruction on a lesser included offense, but only where it is warranted by the evidence.   Mississippi law has long been in accord.  *See, e.g., Jackson v. State*, 337 So. 2d 1242, 1255 (Miss. 1976), *superseded by statute on unrelated grounds as recognized by Gray v. State*, 351 So. 2d 1342, 1349 (Miss. 1977).   As the Supreme Court has explained, *Beck* was premised on the Court's "fundamental concern" that "a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all."  *Schad v. Arizona*, 501 U.S. 624, 645 (1991).  These teachings do not apply where the jury was actually given a lesser included offense instruction.  *Id.* Here, the jury was instructed as to capital murder, murder, and accessory after the fact of murder. Thus, *Schad*, rather than *Beck* applies to this case, and because the jury was not confronted with an "all or nothing" choice, the verdict was not unreliable and no constitutional error occurred. Moreover, *Beck* is of questionable relevance in this case, since the jury here had the option of imposing a sentence of life imprisonment.  *See Howell*, 543 U.S. at 545.  The Mississippi Supreme Court was not prohibited from considering the request for a manslaughter instruction on the basis of the evidence presented.  That court did so and concluded that the instruction was not warranted. Its decision was not contrary to or an unreasonable application of federal law, and this argument cannot succeed.

**13.     The Petitioner Was Denied His Sixth Amendment Right to Confront Witnesses and Evidence against Him As Set Forth in the United States Constitution.**

Despite the heading's wording, this claim relates to the conduct of the prosecutors in this case, whom Simmons accuses of misconduct.  The argument is based upon several statements that occurred during trial, each of which will be addressed below.  The Mississippi Supreme Court considered the arguments in its direct appeal opinion and noted that "Simmons should be procedurally barred from making many of these arguments because he failed to make a contemporaneous objection at trial." *Simmons*, 805 So. 2d at 489.  The court nevertheless considered each of them, and Respondents concede that the claims must be considered on their merits here.

Simmons has cited to several United States Supreme Court cases that were direct appeals of federal prosecutions.  Those cases are inapposite here, as the Court, in those situations, exercises its supervisory powers, rather than resolving constitutional questions.  *See Lowenfield v. Phelps*, 484 U.S. 231, 240 n.3 (1988) (noting that the holdings in such decisions need not be followed on habeas review).  Where a statement made by the prosecutor during argument is challenged by way of collateral review, the appropriate standard of review is not whether the comment was improper or worthy of condemnation, but whether it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The court must consider that the remark "is but one of several components of the trial which may result in the judgment of conviction." *Id*. at 645.  In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Court was presented with several statements made by the prosecutor during closing argument that allegedly mandated reversal:

As far as I am concerned, there should be another Defendant in the courtroom, one more, and that is the division of corrections, the prisons . . . . Can't we expect him to stay in a prison when they go there?

I will ask you to advise the Court to give him death.  That's the only way that I know that he is not going to get out on the public.  It's the only way I know.  It's the only way I can be sure of it.  It's the only way that anybody can be sure of it now, because the people that turned him loose.

As far as I am concerned, and as Mr. Maloney said as he identified this man this person, as an animal, this animal was on the public for one reason.

He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. . . . I wish [one of the victims] had had a shotgun in his hand when he walked in the back door and blown his [the defendant's] head off.  I wish that I could see him sitting here with no face, blown away by a shotgun. . . . I wish someone had walked in the back door and blown his head off at that point. . . . He fired in the boy's back, number five, saving one.  Didn't get a chance to use it.  I wish he had used it on himself.  I wish he had been killed in the [subsequent auto] accident, but he wasn't.  Again, we are unlucky that time.

477 U.S. at 181 nn.9, 10, 11 & 12.

Only after the last comment did defense counsel object to the argument.  *Id*.  The Court affirmed the conviction in *Darden*, noting that the trial court instructed the jurors that the comments of counsel were not evidence.  In addition, two victims of the crime survived and gave eyewitness testimony identifying the defendant as the assailant.  Another witness described his car, and after the car was later involved in an accident, a gun with a misfired shell in the chamber was found near the scene, later described as the same type of gun that killed the third victim.  This "overwhelming evidence," in the Court's opinion, made it unlikely that the jury's verdict was influenced by these comments, however ill-advised.  *Id*. at 182; *see also Ward v. Whitley*, 21 F.3d 1355, 1365 (5th Cir. 1994) ("The argument that Ward was a bad person deserving of death . . . pales beside the other evidence of his bad character . . . .").  The Mississippi Supreme Court did not discuss these cases in

90

its opinion in Simmons's case, but the analysis that it used under state law precedent was similar. The general tenor of its opinion recognized the latitude normally allowed to counsel in making inferences from the record and arguing the case. The court also considered each statement in context and concluded that none of them rose to the level of reversible error. *Simmons*, 805 So. 2d at 490-94.

Because clearly established federal law requires this Court to look at the entire record to determine the impact of the prosecutor's allegedly prejudicial statements, it is important to understand the general tenor of counsel's interactions in this trial. *Darden* permits such a review, noting that many of the objectionable remarks made by the prosecutor in that case were invited by or responsive to remarks made by defense counsel. *Darden*, 477 U.S. at 182 (citing *United States v. Young*, 470 U.S. 1 (1985)). In *Young*, the Court explained the concept of "invited response" as follows: "[T]he Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *Young*, 470 U.S. at 12.

The relationship between counsel appears to have been contentious. While this may not account for all of the prosecutors' remarks at issue – some were not in direct response to anything said by defense counsel – they do supply the background for their general tone.  Simmons claims that several statements made by the prosecutor entitle him to habeas relief. Each will be addressed separately:

a.      **"Quit lying to the jury."**

Prosecutor Dale Harkey made this comment during Harvey Barton's (defense counsel) closing argument on the guilt phase:

91

BY MR. BARTON: I want y'all to look at that.  I want y'all to look at what the definition of robbery is.  But I want to give you a definition.  It's out of the dictionary.

BY MR. HARKEY: That's improper.  He can't stand up and read a dictionary.  It's a definition according to the law, not Webster.

BY MR. BARTON: Judge, I'm not reading the definition of robbery.  If I can continue with my argument, I will clear it up.

BY MR. HARKEY: Well, then quit lying to the jury.

BY THE COURT: Well, you said you were going to read the definition of robbery from Webster's Dictionary.

BY MR. BARTON: No, sir.  The definition of robbery is a jury instruction.  And if I misquoted that, I'm sorry.  I want to give the ladies and gentlemen of the jury out of Webster's Collegiate Dictionary the definition of confrontation, the act of confronting, the statement being confronted as a face to face meeting, the clashes of forces or ideas, conflict.

Tr. 1083.

Obviously, there was a misunderstanding among counsel and the trial court as to what Barton intended to read from the dictionary.  He apparently planned to give the jury the definition of robbery from the instruction, but read the definition of the word "confrontation" from the dictionary.  Unfortunately, his intent was not initially clear.  Harkey's statement was made before Barton clarified his argument, and it is relevant that Barton overlooked the statement and apologized for the confusion.   For purposes of addressing Simmons's claim, the Court will assume for the sake of argument that the remark was improper.  While a personal attack on an opposing lawyer can amount to prosecutorial misconduct, courts are more lenient when the statement arises in the context of an evidentiary objection addressed to the court, not the jury.  *Young*, 470 U.S. at 1; *United States v. Tampas*, 493 F.3d 1291, 1302 (11th Cir. 2007).  Given the context of this remark and the emotional

exchanges that occurred at other points in the trial, the lack of objection to this statement suggests that it was not perceived as being as harsh as it may read.  When compared to the statements made in *Darden*, moreover, it pales in comparison.  For these reasons, habeas relief cannot be predicated on this comment.

      **b.**      **Criticism of Dr. Acton.**

A reading of the transcript of the exchanges between counsel and the court during Haller's testimony demonstrates that the prosecution had some history with the DNA expert for the defense, and it was apparently not favorable.  Specifically, Ben Saucier, the other prosecutor, stated in front of the jury that he had no respect for Dr. Acton, that he "ran him out of this courtroom one time about five years ago and I didn't want to have nothing else to do with him."  Giving Simmons the benefit of the doubt, if the Court were to construe this comment as a "speaking objection," it could arguably be improper.  *United States v. Cochran*, 499 F.2d 380, 391 (5th Cir. 1974); *Tanner v. State*, 764 So. 2d 385, 404 (Miss. 2000).  However, the natural effect of such comments would have been to diminish Dr. Acton's credibility to the jury, had he testified.  Since he did not, it is difficult to accept Simmons's premise that the arguments so infected his trial with prejudice as to have denied him due process.

Simmons also complains about Harkey's argument during the guilt phase regarding the DNA evidence.  Harkey responded to Barton's earlier argument about Haller's testimony, where Barton said:

> And it's a good thing for the State that there's additional evidence in this case other than DNA evidence.  I do not apologize one bit for what I did to Debbie Haller yesterday.  If they are going to try and send somebody to Death Valley, USA on the strength of DNA evidence, let me tell you something ladies and gentlemen of the jury, they better get their act together.  They better get their act together.  It's too

serious to come up here with.  And they call my guy a pseudo expert.  I'm glad for the State's benefit they have got other evidence.

Tr. 1081.

Harkey responded in kind:

> And all this wild speculation, all this wild questions with no answers, all this stuff he wants to feed you with no proof, absolutely no proof except standing up in the courtroom and asking a bunch of questions.  I'm amazed.  Attack everybody, every witness that was put on the stand by the State of Mississippi, for what?  Called our DNA expert a pseudo expert when she said body parts of Jeffrey Wolfe are consistent, skin from this guy, skin cells from Brooke Leaser are consistent.  Our pseudo expert.  And he has the gall to call her pseudo and make it look like he has done something great for the jurisprudence of the State of Mississippi.  His guy won't even come to the courtroom.  Pseudo.

Tr. 1102-03.

On habeas review, the question is whether the prosecutor's comments deprived Simmons of a fair trial.  The Court explained in *Darden* that such remarks could have that result if they implicate other specific rights, such as the right to remain silent or the right to counsel.  *Darden*, 477 U.S. at 182.  Simmons claims that these remarks were an "improper comment on the defendant's failure to call witnesses."  Pet'r Br., p. 148.  The defendant's failure to call witnesses in this situation does not implicate a right that deserves such protection.  Under Mississippi law, a prosecutor may comment on the defendant's failure to call a witness that is under his control, so long as that witness is not the defendant.  *Ross v. State*, 603 So. 2d 857, 864 (Miss. 1992).  Federal law is in accord.  *United States v. MMR Corp.*, 907 F.2d 489, 501-02 (5th Cir. 1990).  Where state law permits such a comment, habeas relief is unavailable.  *Nichols v. Scott*, 69 F.3d 1255, 1284 (5th Cir. 1995).  Simmons cannot demonstrate constitutional error based on the prosecutors' comments about Dr. Acton.

### c.      Sociopath.

Simmons argues that Harkey attempted to "arouse the passions and prejudices of the jury by calling Mr. Simmons a 'sociopath' during closing arguments." Pet'r Br., p. 148. The comment was a response to Barton's contention that Leaser had removed Wolfe's pistol from Simmons's home when she escaped. Harkey said:

> But she is going to have the presence of mind, eighteen year old Brooke Leaser, when she gets loose to think I got to really set them up, I have to frame these guys, I'm going to take that .9 millimeter because, gee whiz, I don't want nobody to know old Jeff had a .9 millimeter. The presence of mind. Can you imagine that? She is as much a sociopath as this guy is probably if that's what she is thinking after being locked up in that box for seven or eight hours, six hours whatever?

Tr. 1102.

Given the high standard for habeas consideration announced in *Darden*, this remark does not justify relief.

### d.      Lauderdale County jury.

Simmons complains about Saucier's remark, during closing argument in the penalty phase, explaining that the jury was selected in Lauderdale County because of the heinousness of Wolfe's murder. He neglects to mention Barton's statement during his closing on the guilt phase:

> Headlines, TV; that's why we came to Lauderdale County to try and get a fair and impartial jury that hadn't been prejudiced, hadn't been inflamed, that didn't know anything about the facts of this case, that would keep an open mind so that I could try and save this boy's life even though admittedly a heinous gruesome crime occurred.

Tr. 1086.

Saucier's complete statement was, "And counsel opposite is right. We could not get twelve people in this county because of the absolute horrible nature and how it impacted our county."

Given the context in which it was made, this brief remark did not negatively impact Simmons's right to a fair trial.

###### e.  Voir dire.

During voir dire, prospective jurors were asked whether the other charges brought against Simmons – kidnaping and rape – for which the death penalty was not available, would influence their decision to impose the death penalty.  One of the jurors, Barbara Hanna, responded, "I did not put it on the form because it happened years ago in 1979.  It was my ex-husband's niece who was murdered during a rape."  Harkey responded, "Is there anything about that experience that would influence you today?  I mean, 1979.  I'm not sure Mr. Simmons was in the State of Mississippi at that time.  Would there be anything about that that would influence you one way or the other?"

Apparently, Simmons believes that the prosecutor was inferring by this remark that he could have been the rapist.  No objection was lodged, so it is likely that the statement passed unnoticed by counsel opposite, as well as the other jurors.  As the Supreme Court has said, "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  Hanna was not selected to serve on the jury, nor can it be said that this remark deprived Simmons of a fair trial.

###### f.  Leaser would have been killed if she had not escaped.

Simmons asserts that this argument was improper, as there was no evidence in the record that he intended to kill Leaser.  Clearly, there was evidence that Wolfe was murdered and his body dismembered and disposed of in the bayou.  Leaser testified that Simmons held a gun to her head when he raped her, telling her that her life depended on how well she performed.  She also told the

jury that, after she escaped from Simmons's house, she saw him drive up and take something inside the house.  Later, when she entered the house with police, she found her belongings, which had been removed from the motel room.  All of these facts lead to the conclusion that Simmons disposed of Wolfe's body to avoid identification as his murderer, and it is not far-fetched to conclude that he was also eliminating evidence of Leaser's presence in Moss Point.  The ultimate "elimination" would have been to murder Leaser and dispose of her body, as well.

Prosecutors are typically given broad latitude insofar as their argument draws reasonable inferences from the evidence that is before the jury.  *Drew v. Collins*, 964 F.2d 411, 418 (5th Cir. 1992); *Smith v. Black*, 904 F.2d 950, 973 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992).  This is so even where the appellate court applies the limitations of its supervisory powers, which are stricter than the standard for habeas relief.  *United States v. Thompson*, 482 F.3d 781, 785-86 (5th Cir. 2007) (holding counsel has the right, during argument, "to state his contention as to the conclusions that the jury should draw from the evidence.").  The evidence before the jury certainly supported the inference made by the prosecutor, and habeas relief is not available.

### g.    Simmons molested his stepdaughter.

During his closing argument in the penalty phase, Harkey referred to Simmons as a man who "planned and plotted this diabolical scheme to get money and to have a sex toy from the fellow who now can't visit with the oldest daughter, stepdaughter."  This argument stemmed from the cross-examinations of Lynette Holmes and Lori Simmons during their mitigation testimony.  When Holmes was asked whether Simmons was barred from seeing his children, Holmes replied, "I have been told that, but not the two youngest ones."  During Lori Simmons's cross-examination, she was asked about her divorce: "And it had to do with allegations that she [her oldest daughter] made

97

against Gary.  Isn't that correct?"  Simmons replied, "Yes, sir."  Harkey's argument went no further than the facts established by the testimony and did not prevent Simmons from receiving a fair trial.

       **h.**       **Wolfe's gun was found in his car.**

Simmons's attorneys relied on their theory of self-defense to exonerate him or lessen his sentence.  He complains that the prosecution falsely told the jury that Wolfe's gun was found in his car, thereby preventing them from arguing that Wolfe was the aggressor in Simmons's kitchen.  Prior to Leaser's testimony, during the cross examination of Officer Lionel Howie, Barton asked, "Did not Charlene Leaser tell you, please, sir, in response to your question that Jeffrey Wolfe always carried a gun and he had a 9 millimeter pistol?"  Saucier objected, adding, "[C]ounsel is misleading.  If there was a pistol, it was in the car."

Although this was a speaking objection Leaser was later asked, "This .9 millimeter that you spoke about earlier, do you know whether that was on his person or in his vehicle?"  She replied, "It wasn't on him."  In light of that testimony, the prosecutor's remark did not deny Simmons a fair trial.

       **i.**       **Timothy Milano's record.**

At trial, the State offered a motion in limine to prohibit either side from introducing any testimony or evidence with respect to either Jeffery Wolfe's or Timothy Milano's prior criminal record.  Barton responded that the investigative file produced to him by the State indicated that Timothy was on probation from Connecticut for a drug possession conviction.  One of the prosecutors agreed and told the judge that Timothy pleaded guilty to sale of narcotics in Connecticut in 1994.  Barton added that Timothy received a sentence of four years, execution suspended, with three years probation.  It did not appear that either attorney had actual documentation of the plea and sentence, their knowledge having come from an arrest warrant application from Connecticut to the

Moss Point Police Department to hold Timothy for a probation violation.  The motion was granted on grounds of relevance.

Simmons now complains that the prosecutor misstated the evidence at the hearing on his motion for a new trial, by telling the court that the prosecution never received proof of Timothy Milano's conviction.  He argues that this statement was contradicted by Officer Merrill's testimony, during a proffer, that law enforcement had received notice from Connecticut of the probation violation.  The type of notification was not further explained, and defense counsel stated that he had no way to further authenticate the charge.  The trial court ultimately ruled that the evidence of Timothy's prior conviction was inadmissible; however, the jury did hear testimony that both Timothy and Simmons owed Wolfe money for drugs.

Simmons does not explain how a statement made during a post-trial hearing denied him the right to a fair trial.  In any event, the statement was not false.  Saucier argued during the hearing that the State could not find Timothy's conviction.  "But we did the very best we could.  We found no record.  We used N.C.I.C.  It's not perfect, but it's the best we can do.  We didn't have any locations or locals to call."  After Saucier finished his argument, the court asked Barton whether he wanted to respond, and he said, "That will be fine, Your Honor."  The nature of the proof of Timothy's conviction likely had no influence on the trial court's decision to exclude this evidence, and there is no constitutional error here.

In sum, a habeas petitioner contesting statements or arguments of the prosecution must meet a high standard of proof to establish that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 642.  Where evidence of guilt is overwhelming, the burden is even heavier.  Here, even assuming the prosecutors made remarks

that could be deemed objectively improper, they did not have the effect argued by Simmons.  He cannot receive habeas relief on their account.

14.    **The Trial Court Prevented Petitioner from Fully Presenting His Defense in Violation of His Sixth and Fourteenth Amendment Rights As Set Forth in the United States Constitution.**

This issue involves the presentation of evidence regarding Wolfe's alleged problems with his former roommate in Houston, which Simmons maintains was essential to establishing his claim of self-defense.  Much of the factual basis for this theory has been presented earlier.  The record is confusing, for several reasons.  Barton attempted to question Leaser by referring to three different statements she gave investigators.  The initial page of each statement appears in the Clerk's Papers, and two additional pages from one of the statements appear elsewhere.  However, the statements were never introduced into evidence, and the portions referred to by Barton are not in the record.  He quotes from portions of these statements and refers to others, but the contents are not sufficiently disclosed to fully understand what Leaser told officers on these occasions.  The confusion is compounded by the fact that Barton and Leaser interrupted each other frequently, and the testimony was further disjointed by objections.  The gist of Leaser's story relative to the earlier event in Houston remains unclear, at best.

The following constitutes what the jury actually heard relative to Simmons's claim that Wolfe was the aggressor:  Dennis Guess testified that Simmons told him that there was "some confrontation between the parties" and "the boy broke bad on him and this is what happened."  Guess later said he thought "that Wolfe and Timmy were in a heated argument over some money or drugs.  I'm unclear on that.  That seems to be the nature of the argument."  Then, he explained his understanding that Simmons was supposed to have sold drugs and collected money for Wolfe.  "It

didn't happen.  Timmy was supposed to have wasted the money, or the drugs, or what not.  I don't know.  But, anyway, the boy broke bad on him and threatened him, to do something to him.  And he said he just shot him."

During her direct examination, Leaser told the jury that when she, Simmons, and Wolfe were sitting on the front porch of the house, "Jeff was telling Gary about his roommate had ripped him off. . . . And Gary said that he was glad that Jeff finally made it to get his money because he was going to like flip it."  She repeated that testimony later, in cross-examination:

> Q.     Now, Brooke, you said that when you guys were on the porch when Gary was there by himself that Jeff was telling Gary on the porch about the robbery that occurred to him in Houston?
>
> A.     Yes.  And he was telling him how he got robbed and stuff.
>
> Q.     I'm sorry?
>
> A.     Jeff was telling Gary that he got robbed and about that and stuff.

Tr. 951-52.

Barton was prevented from asking Leaser whether that conversation was repeated in the house, in front of Timothy, on grounds that the question had been asked and answered.  The jury was excused, and Leaser explained the content of a statement she made to Lionel Howie immediately after the crime.  She related that the conversation occurred again inside the house.  "Me, and Gary, and Tim.  Tim was in the house still. . . . He was telling them both.  He was talking to both of them. I mean, he wasn't talking to me.  I had heard it."  This exchange followed:

> Q.     Then the detective said – and his reason for coming here was what?
>
> A.     To get money.

101

Q.      And that's all he said.  Do you remember the question?  He didn't say it involved no drugs, but did he tell you he was ripped off in Houston?

A.      Yes.  I have already answered that question five times.

Q.      Did he say by whom he was ripped off?

A.      His roommate.

BY THE COURT:       That's been in evidence.

BY THE WITNESS:   That's been asked five times.

BY MR. HARKEY:   That's in evidence.

BY THE COURT:       It came out in direct.

BY MR. HARKEY:   That was the conversation related on the porch.

Q.      And who was his roommate?  Your response?

A.      I don't know.

Q.      But what did you say?

A.      I said he's dead.

Q.      He's dead.  And Lionel Howie asked you did it have something to do with Jeff?  And your response?

A.      And dope.  But that's just from what Jeff told me.  I didn't ask him how did they do it, why did they do it.  I didn't ask that.  That's just a conclusion.

Q.      But you concluded that the guy that ripped off –

A.      No.  Jeff told me that the guy that ripped him off would be dead.

Q.      Is dead?

A.      Is dead.  I don't even know that person either.

Q.      Did Jeff tell you how long before you guys were in Pascagoula that it was that he had been robbed in Houston?

. . . .

A.      About a week ago.

Q.      And this other person has been dead ever since?  And your response was what?

A.      That's what he said.

Q.      That's what he said to who?

A.      To Sonny.  But that don't have nothing to do with Sonny, I don't think.

. . . .

Q.      Isn't it true that that night when you and Jeff and Sonny and Jennifer went out to eat or at the hotel room that Jeff told Sonny about getting robbed in Houston the week before and that the guy who did it on a dope deal was dead?

. . . .

A.      I really don't know.  I don't remember that conversation.  I just read it, but I don't remember people speaking it.

Tr. 961-64.

The prosecution explored this conversation further during the proffer.

Q.      The conversation that Jeff was telling Gary and Tim – or was Tim even there at the time?  Try to think back.  Was Tim there?  Did it take place out on the porch or inside the house about this roommate or being ripped off?

A.      He told it a couple of times, you know.  I mean, I don't remember.  I don't remember what I knew before and what I figured out afterward or I know after.  It's all running together.

Q.      I'm sorry.  Was he relating this story in conversational terms like he would to friends?  Was it just part of the conversation?

A.      Just part of the conversation.

Q.      Conversational terms; hey, you know, something had happened to me?

103

> A.    Yeah.  And it was just part of the conversation.
>
> Q.    No confrontation?
>
> A.    No, no confrontations at all.  They had acted like they were the best of friends for years.

Tr. 966-67.

Leaser continued during counsel's questioning to insist that there was no confrontation.

Barton then referred to the statement Leaser gave to Howie:

> Lionel Howie said he is dead, how did it happen.  (Reading)  I think, no he is not dead.  Jeff fought his roommate, he must have got his stuff back, but he didn't kill him.  What was the question again?  Well, what else do I need to know?  You said he was dead, now you say he is not dead.  He was dead, but now he is not dead.  I was thinking of – No, this was totally different.

Tr. 968.

The judge refused to permit this evidence to be given to the jury, ruling, "She doesn't know anything about the Houston thing unless somebody told her that.  And that's hearsay, and it's not admissible in this case.  It's not even material in this case."  At that point, Barton argued that Leaser's story should be presented to show the contradiction between the statement and her direct examination, but the judge refused, stating, "You can argue that on closing argument."  Barton argued that he could not, because the statement was not in evidence.  The judge refused to change his ruling.

However, after the jury returned, Barton was able to get some of the testimony in:

> Q.    But the conversation about the robbery in Houston also occurred when Jeff was standing in the doorway of the kitchen when he was telling you and Gary and Timmy about it, didn't it?
>
> A.    Can you say that again?

104

> Q.     Just before the shooting Jeff was standing in the doorway of the kitchen?
>
> A.     Yes.
>
> Q.     And he was telling Gary and Timmy about having been robbed in Houston the week before?
>
> . . . .
>
> Q.     And while he was telling them about the robbery is when the shooting occurred?
>
> A.     Right.

Tr. 974-75.

This issue was raised on direct appeal, where Simmons argued that the statements fell within the exception to the hearsay rule for prior bad acts of a victim that are known by the defendant, to exhibit a basis for the defendant to view the victim as an aggressor. *Simmons*, 805 So. 2d at 474. The Mississippi Supreme Court recognized that exception, but held that the evidence offered must be coupled with evidence of an overt act by the victim. *Id.* (citing *Heidel v. State*, 587 So. 2d 835, 845 (Miss. 1991)).   The court held that there was no such evidence, concluding:

> The only testimony resembling this comes from Dennis Guess who testified that Simmons told him that Wolfe "broke bad."  This is contradicted by the testimony elicited from Leaser who said that Wolfe and Milano had not behaved in a confrontational manner, and in fact that they acted like friends.  Beyond this, neither Milano nor Simmons had any personal knowledge of the incident in Houston, as in the *Heidel* case.  It is clear that the trial judge was correct in excluding the testimony and references to it as hearsay.

*Id.* at 475.

The admissibility of evidence is an issue of state law, not ordinarily cognizable on habeas review. *Lockett v. Anderson*, 230 F.3d 695, 709 (5th Cir. 2000); *Passman v. Blackburn*, 652 F.2d 559, 568 (5th Cir. 1981).  As the Supreme Court has made clear, in the context of habeas review,

"mere errors of state law are not the concern of this court, unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution." *Barclay v. Florida*, 463 U.S. 939, 957-58 (1983); *see also Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007).   A federal court considering a habeas corpus petition does not sit as a super state supreme court to review errors under state law.   *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988); *see also Derden v. McNeel*, 978 F.2d 1453, 1460 (5th Cir. 1992).   Thus, unless the error rises to the level of denying the petitioner a fundamentally fair trial, it does not justify habeas relief.   *Passman*, 652 F.2d at 568.

The Due Process Clause includes the rights "to confront and cross-examine witnesses and to call witnesses in one's own behalf . . . ."   *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). However, the Supreme Court has made it clear that, even in a criminal case, evidence relevant to the defense may be excluded on procedural grounds.   *Michigan v. Lucas*, 500 U.S. 145, 151 (1991).   The Due Process Clause would be violated only if the exclusion of the evidence violated a fundamental principle of justice.   *Patterson v. New York*, 432 U.S. 197, 201-02 (1977).   The Court in *Chambers* recognized the evidentiary limitations of that right.   "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."   *Chambers,* 410 U.S. at 302.   While Chambers's conviction was reversed on due process grounds, the Court warned that its holding was highly fact-specific and did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures."   *Id*. at 302-03.   In the later case of  *Taylor v. Illinois*, the Court found that there was no constitutional violation in excluding evidence as a discovery sanction, declaring "[t]he accused does

not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  484 U.S. 400, 410 (1988).

The Mississippi Supreme Court's decision rested on its interpretation of state law regarding the admissibility of evidence of a prior threat by a victim to a defendant.  *Heidel*, the case at issue, really did not implicate the hearsay rule, but the rule excluding evidence of prior bad acts and the rule excluding evidence that is irrelevant.  In this case, the fact that the evidence was also hearsay was another obstacle for Simmons.

In *Heidel*, the victim had previously attacked her husband with a butcher knife, and he had been forced to barricade himself in his room.  On the night of the murder, the couple had been drinking, and she had struck him with her purse when he danced with another woman, so hard that blood ran down his face.  *Heidel*, 587 So. 2d at 837.  Later that evening, when the couple returned home, Heidel shot his wife.  Her body was found on the kitchen floor, with a butcher knife near her hand.  The Mississippi Supreme Court held that, under those circumstances, Heidel should have been permitted to present evidence of the earlier attack.

Here, the record reflects that the story about Wolfe's roommate was repeated at least twice – once on Simmons's porch and once in his kitchen – and possibly three times, including the dinner with Sonny Milano.  There can be little doubt that Timothy Milano heard it at least once.  It is not clear whether each, or any, recitation of the story to Simmons or the Milanos included a statement that Wolfe had actually killed his roommate.  If Simmons heard that story, he did not repeat it to Guess.  Under Mississippi law, the story is not admissible unless there was an overt act by Wolfe at the time of the murder.  *See id.* at 845-46.  As noted by the Mississippi Supreme Court, the only evidence of an overt act was Guess's testimony that Wolfe "broke bad" on Simmons.  *Simmons*, 805

So. 2d at 475.  There is ample evidence to the contrary, most notably Leaser's testimony.  According to her, Wolfe displayed no concern about going to Simmons's home late at night to collect a drug debt, he did not carry his gun into the house, and there was no "confrontation" prior to the shooting.  In fact, she testified that she was surprised by the shooting and initially thought that the shots came from outside the house.  Her testimony and the examination of Wolfe's body parts indicates that he was shot in the back, and, possibly, in the side.  There is no evidence of any injury to Timothy Milano or Simmons.

Moreover, the evidence in Simmons's case does not in any way support his claim of self-defense.  He was permitted to present to the jury testimony that Wolfe brought a gun to Mississippi and that he had a prior run-in with his roommate over drug money.  It did not violate a fundamental principle of justice to exclude the statement that the roommate was dead, particularly in the absence of any reliable evidence that Wolfe played any role in his death.  For these reasons, this challenge to a state evidentiary ruling does not justify habeas relief.

**15.    Petitioner Was Denied His Rights Guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution Due to the Cumulative Effects of the Errors at Trial.**

Simmons asserts that his conviction is unreliable and his sentence inappropriate due to the cumulative effect of the errors he alleges occurred at his trial.  He advanced this argument both on direct appeal and in his request for state post-conviction relief.  In its opinion on direct appeal, the Mississippi Supreme Court held that there must be reversible error in some part of the trial in order for there to be error to accumulate.  *Simmons*, 805 So. 2d at 508 (citing *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1996)).  There can likewise be no cumulative error if the errors complained of are procedurally barred.  *Id*.  This holding was repeated in the opinion denying post-conviction relief.

108

*Simmons*, 869 So. 2d at 1008.  These decisions are consistent with Mississippi law, which holds that

the errors that are accumulated need not, in themselves, be reversible; however, where there is *no*

error, harmless or otherwise, there can be no cumulative effect of errors that requires reversal.  *Lynch*

*v. State*, 951 So. 2d 549, 555 (Miss. 2007).

Simmons cannot show that this decision was contrary to, or an unreasonable application of,

clearly established federal law as set forth by the United States Supreme Court.  There is no Supreme

Court case on this issue, although the Court has been called upon in other cases to set a standard for

cumulative error review.  The Fifth Circuit in *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992),

adopted a rigorous standard for cumulative error analysis: "[W]e now hold that federal habeas corpus

relief may only be granted for cumulative errors in the conduct of a state trial where (1) the

individual errors involved matters of constitutional dimension rather than mere violations of state

law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so

infected the entire trial that the resulting conviction violates due process.'"  *Id.* (quoting *Cupp v.*

*Naughten*, 414 U.S. 141, 147 (1973)).  *Derden* continues to be followed in the Fifth Circuit.  *See,*

*e.g., Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (repeating the language from *Derden*

quoted above and stating, "[a]s is apparent from this standard and as this court has stated explicitly,

where individual allegations of error are not of constitutional stature or are not errors, there is

'nothing to cumulate.'").

Each individual error alleged by Simmons has been considered and found to be without

merit.  This is not a situation where there are several constitutional errors that are, in themselves,

harmless, but, when cumulated, cast doubt on the validity of the verdict.  Therefore, as in *Turner*,

there is nothing to cumulate, and this argument cannot serve as the basis for habeas relief.

### III.  CONCLUSION

In conclusion, the Court has carefully reviewed the record in this case and considered each ground for habeas relief asserted by Petitioner Gary Simmons.  The Court finds no part of the Mississippi Supreme Court's opinions to be an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented, sufficient to justify habeas relief.  For the reasons discussed more fully herein, Gary Simmons is not entitled to habeas relief under 28 U.S.C. § 2254.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Gary Carl Simmons's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

IT IS, FURTHER, ORDERED AND ADJUDGED that this action is hereby **dismissed with prejudice**.  A separate final judgment dismissing this action with prejudice shall be entered in accordance with Fed. R. Civ. P. 58.

SO ORDERED AND ADJUDGED, this the 26th day of September, 2008.


*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

110